Nott, J.,
delivered the opinion of the court;
When the Indian Depredation Act, 1891, was framed there were- two classes of Indian claims before Congress, one of which consisted of claims for depredations committed by Indians who had never treated with the United States and the other of claims for depredations by Indians who had been in treaty relations.
Between these classes the administrative history of the claims had drawn an unusually broad line of distinction. Until 1$72 Congress had kept within their -own hands, that is to say, in the hands of their committees, the exclusive power of investigation. In 1872 there had accumulated thousands of claims not disposed of and, what is equally to the point, many treaties with many nations, tribes, and bands. A Congressional committee could not from the nature of things intelligently investigate in the first instance these claims and treaties. Accordingly the Act 29th May, 1872 (17 Stat. L., pp. 165,190, § 7), placed the investigation primarily in the Interim' Department, and required the Secretary to. do what committees had previously done, viz, “carefully investigate all such claims as may be presented” and “ report to Congress at each.session thereof the nature, character, and amount of such claims, whether allowed by him or not, and the evidence upon which his action was based ” with a proviso, “ that no payment on account of said claims shall be made without a specific appropriation therefor by Congress.”
*335 In 2885 Congress introduced the word “ citizen ” into the system of statutes relating to Indian depredations, and expressly confined the action of the Secretary to disabilities “chargeable” to Indian tribes “ by reason of any treaty.” The effective words of the statute (Act 3d March, 1885, 23 Stat. L., p. 376) are that the Secretary shall prepare “ a complete list ” of all claims “whichhavebeen approved” “ andnowremainunpaid ;” “and also of all such claims as are pending but not yet examined on behalf of citizens of the United States” “chargeable against any tribe Of Indians by reason of any treaty.” He was also directed to report “ a reference to the date and clause of the treaty creating the obligation for payment.”
In this plight affairs continued until 1891. The Secretary continued to investigate and report to Congress; and Congress continued to refer his reports to the Committees on Indian Affairs; but substantially none of the reports were acted upon and none of the claims were paid and the accumulation grew steadily larger and larger. How many there were we do not know; but at this time the number of Indian depredation cases which have been brought in this court exceeds 10,800.
The Indian depredation act 1891 contains the following jurisdictional provisions:
“Beit enacted, etc., That in addition to the jurisdiction which now'is, or may hereafter be, conferred upon the Court of Claims, said court shall have and possess jurisdiction and authority to inquire into and finally adjudicate, in the manner provided in this act, all claims of the following classes, namely:
“First. All claims for property" of citizens of the United States taken or destroyed by Indians belonging to any band, tribe, or nation, in amity with the United States, without just cause or provocation on the part of the owner or agent in charge, and not returned or paid for.
“Second. Such jurisdiction shall also extend to all cases which have been examined and allowed by the Interior Department.
“And also to such cases as were authorized to be examined under the act of Congress making appropriations for the current and contingent expenses of the Indian Department, and for .fulfilling treaty stipulations with various Indian tribes for the year ending June 30,1886, and for other purpose, approved March 3, 1885, and under subsequent acts, subject, however, to the limitations hereinafter provided.
“Third. All just offsets and counterclaims to any claim of *336 either of the preceding classes which may be before such court for determination.” (26 Stat. L., p. 851, § 1.)
The first clause imposes citizenship and amity as conditions to judicial redress in those cases which stand exclusively upon the act of depredation — upon the fact of property “ taken or destroyed by Indians;” the second opens the door of jurisdiction to “all cases which have been examined and allowed by the Interior Department” and “to such as were authorized to be examined under the act” of 1885; but neither declares a liability either on the part of the Indians or of the United States.
As to the first jurisdictional class of cases, if these proceedings are considered as suits against Indian defendants, they being the parties who, in contemplation of the act, are to respond in damages whenever they can be identified, immediately or ultimately, it was but just that they should not be vexed by frivolous suits resting on imaginary responsibilities. Citizenship and amity would be essential conditions, if such claims were prosecuted against a foreign power. The United States then would ordinarily seek redress only for wrongs done to their own citizens; and a foreign power would acknowledge responsibility only where depredations occurred during a state of peace. The international condition of the Indian tribes is one not easy to define, but it is undeniable that they have been accorded the character of nationality, i. e., as possessing a qualified title to the soil, as being capable of entering into treaty relations, as being entitled in war to belligerent rights. In the words of Marshall, “The acts of our Government plainly recognize the Cherokee Nation as a state, and the courts are bound by those acts.” (The Cherokee Nation v. Georgia, 5 Peters R., 16.) And this recognition holds good notwithstanding his definition of them as “ domestic, dependent nations.” The United States have power to bring these “domestic, dependent nations” into the tribunal of their courts, because they are domestic and dependent; but when they are brought in in their tribal or national character, it can not be supposed that the United States have intended thereby to cast upon them new and unknown and undefined liabilities. So far as-the claimants are concerned the United States are defendants; but as regards the Indians, they are plaintiffs; and when a controversy between nations comes into the judicial forum for adjudication the judiciary must administer the *337 law which governs and regulates tbe rights of such litigants, viz, the treaties' which they have made, or that system of international, ethics which the Constitution recognizes as “ the law of. nations.”
There may indeed be cases where the Indian defendants as “domestic, dependent nations” must be held responsible for obligations imposed upon them by statutes of the United States — cases where the United States as the supreme, responsible power were obliged, for the general welfare, to trench upon the nationality of the tribes, and prescribe duties and impose liabilities. But such liabilities are not created by ex post facto laws, and if they exist will be found in earlier statutes than this act, the purpose of which is to confer jurisdiction and givó a remedy.
1 n the second jurisdictional clause neither of these words, “amity” or “citizenship,” would have been pertinent. When the grant of jurisdiction passed to the court there were claims, resting on treaties and statutes in which there were terms broad enough to include “inhabitants.” In such cases it would be no defense for the Indian defendants to say that inhabitants whom they despoiled were not citizens; and, conversely, if the United States secured stipulations in favor of inhabitants, on the faith of which aliens went into the dangerous vicinage of the Indians, it was but right to allow them the jurisdictional privilege of prosecuting their claims.
Nor was the word “amity” required in the second clause, for there might be treaty stipulations which looked forward to prospective. indemnities in future wars, and there might be indemnities which were exacted for past wars. The treaty with the Hogue River Indians, 10th September, 1853 (10 Stat. L., p. 1018), reserves' $15,000 to pay “/or the property of the whites destroyed by them [the Indians] in the late war.” 'The Act 16th February, 1862 (12 id., p. 052), abrogated all treaties with the Sioux and forfeited all lands in Minnesota, and “ all annuities,” and apportioned the money among the survivors who had suffered by their depredations. Whether there were in fact such stipulations or such indemnities is not essential to the jurisdictional question, for it is certain that there were claimants before Congress who insisted that they were legally entitled to redress, notwithstanding the fact that they were not citizens, and claimants who insisted that they were legally entitled to redress, *338 notwithstanding the fact that the depredations were acts of war; and Congress, instead of passing upon these questions by-granting or refusing reliei, sent them by means of a general statute into that.branch of the Government where legal rights are tested and determined.
It has indeed been suggested that these words “citizens” and “amity,” though expressed only in the first clause, are to be- understood as words of jurisdiction in the second; that jurisdiction does not (though the act says it does), “ extend to all cases which have been examined and allowed by the Interior Department,” but only to that portion of them in which the claimants were citizens and the Indians in amity. In other words,' it is suggested that Congress have already adjudicated those two questions adversely to the claimants and withheld those cases from the consideration of the court.
An examination of the legislative condition of affairs will show that this could not have been the case.. There were certainly hundreds and thousands of such claims awaiting legislative action'; Secretaries of the Interior had examined and allowed them without regard to these jurisdictional conditions; the claimants maintained that the Indians were liable by reason •of their treaties, and the Indians maintained that they were not liable, notwithstanding their treaties; and, finally, Congress never by any legislative act had indicated a decision of that controversy, or made the slightest discrimination between these and other claims. If we estimate their number by the character of the cases which have come before the court, the result will be that about half of the Indian claims, pending in Congress when the act was passed were either for property destroyed in war or those of aliens. If, then, this court has not jurisdiction of them, the present condition of affairs in Congress is this: That about half of the claims which have accumulated since 1872 are still pending there, the claimants still insisting that the Indians are liable for depredations committed by a tribe during hostilities, the Indians still contending that no such liability exists, and the legislative discretion still withholding action of any kind.
But Congress attached to these jurisdictional clauses of the statute a legislative construction which is overwhelming on the question of intent. The thirteenth section declares *339 something equivalent to this: Inasmuch as the jurisdiction hereby intended to be conferred will extend to all cases where there is a liability on the part of the Indians, or-a liability on the part of the United States, “ the investigation and examination of Indian depredation claims” under all former laws “ shall cease.”
Could Congress have intended to abolish the executive or legislative investigation of claims where a liability exists unless they at the same time intended to transfer them for tlie-inves-tigation of this court? A statutory construction which at worst merely brings questions of legal right to the final determination of the Supreme Court is a construction which can not err-very far from the right one.
The legislative history of the act leads to the same result. The bill as it passed the House was - essentially different from the act as it now stands. The Senate struck out many of its provisions, and reduced it to little more than the first j urisdictional clause. The bill then went to a conference committee. From the result in conference we must infer- that something like this passed: The House conferees must have said, u There is a vast number-of claims pending which have been allowed by the Secretary of the Interior ; the claimants assert that the allowances are legal and the claims should be paid. The House doubts this.and desires thatthe questions involved be determined by the judiciary. The House also desires that all Indian claims in which a legal right is asserted shall be brought to the test of a decision by the Supreme Court. Therefore the House has framed the thirteenth section.” The Senate conferees, we may believe, replied, “ Very well' draft a provision that will effect this;” and thereupon some member sat down and wrote, “ such jurisdiction shall also.extend to all cases which have been examined and allowed by the Interior Department” — a perfectly clear provision when the facts are understood. If was then remembered, we may still assume, that there was a smaller mass of claims not yet allowed but pending in the Department under the act of 1885. Accordingly the jurisdiction was further -extended, not to all pending claims, but to “such cases as were authorized to be.examined” by the Department. It naturally followed, when this policy of sending all Indian depredation claims to the judiciary was adopted, *340 that executive investigations should not be allowed to go on, and accordingly the new policy was made complete by the addition of section 13.
If the committee of conference had inverted the two jurisdictional clauses, making- the second the first, and the first the second, it is safe to say that no question of interpretation would have arisen.
Tiie"statute would then provide that the jurisdiction “ shall extend ” (1) “ to all cases which have been examined and allowed by the Interior Department ;” (2) “ to such cases as were authorized to be examined” by the Department under the act of 1885 ;” (3) “ to all [other] claims for property of citizens taken or destroyed,” by Indians, “ belonging to a nation, • tribe, or band in amity with the United States.”
Concerning this word “amity” and the interpretation which should be given to it, there have been repeated and ingenious arguments in a number of cases now before the court. It first occurs in the “ Act to regulate trade and intercourse' with the Indian tribes, mod to preserve peace on the frontiers, 19 May, 1796? (1 Stat. L., p. 469, § 6), wherein it is provided that any person guilty of killing an Indian “ belonging to any nation or tribe of Indians in amiity with the United, States? shall suffer death; it is reiterated by the acts 1799 and 1802, and between the act 1796 and the act 1891 is said to have been-repeated or implied in fifty statutes.
When a word has been thus employed through a century in numerous acts of Congress and with reference to the same subject-matter — our international relations with the Indian tribes — it is manifest that it must be taken and used in the last statute in the same sense that it was employed in the first. The judiciary can not ascribe a new meaning to it at any point in the-series; what it meant at first it means always and now. The question then is, What did it mean in 1796, when the law declared it to be murder to kill an Indian of a tribe “ in amity with the United States'? ”
Fortunately, there is an authority to which we can appeal that is, for the purpose of this decision, higher than modern dictionaries or general usage, and that authority is the formal and public employment of the word in the contemporary intercourse of the Government with foreign powers; that is to say, in the treaties of the last century.
*341 . Tbe treaty with France of 1778 is entitled u treaty of amity and, commerce” (1 Stat. L.,p. 12). The treaty with the Netherlands, 1782, is entitled “ treaty of amity and commerce ” (ib., p. 32). The provisional articles with England, 1782, are to attain “peace and friendship” (ib., p. 54). The treaty with Sweden, 1783,is entitled “treaty of amity and commerce (ib.,p.60). The treaty of peace with England, 1783, is to establish uperpetual peace and harmony” (ib., p. 80). The treaty with Prussia, 1785, is entitled “ a treaty of amity and commerce” (ib., p. 84). The treaty with Morocco, 1787, is entitled “ treaty of peace and friendship ” (ib., p. 100). The treaty with England, 1794, is entitled “ treaty of amity, commerce, and navigation” (ib.,p. 116), but the body of the treaty drops the term amity and provides for “ a true and sincere friendship” (art. 1). The treaty with Algiers, 1795, is entitled “ a treaty of peace and amity” (ib., p. 133). The treaty with Spain, 1795,is entitled u treaty of friendship, limits, and navigation” (ib., p. 138). The treaty with1 Tripoli, 179.6, is entitled “treaty of peace and friendship ” (ib., p. 154). The treaty with Tunis, 1797, is likewise entitled “treaty of peace and friendship ” (ib., p. 157). The treaty with Prussia, 1799, is entitled “ treaty of amity and commerce” (ib., p. 162), and this is the last treaty of the last century.
Thus it will be seen that at t]ie time when this term “ amity’7 first came into a statute regulating intercourse between our citizens and the Indian tribes it had no special significance in diplomatic usage or in treaties regulating our intercourse with foreign powers, and was interchangeable with the phrase “ peace and friendship.” It will also be observed that its use originally in the American part of the treaty of 1778 was accidental. The other part being in the French language, the translator who rendered it into English naturally used “ amity” as the equivalent of “ arnitié.” In the treaty with Spain, 1795, the Spanish word “ amistad” was not so suggestive of amity, and accordingly the word “friendship” is used. In the Jay treaty, 1794, the term “ amity ” crept into the title, but in the body of the instrument the commissioners came back to the more familiar terms of “ peace and friendship,” showing that they regarded this phrase as the equivalent of the Latin derivative in the title. In the treaties with Tripoli and Tunis, where there was no part in French, we have “ peace and friend.ship;” but in the treaty with Algiers we have “peace and *342 amity.” Thus it appears positively and negatively that during the latter part of the last century a treaty of amity was in public estimation and in fact nothing more or less than a treaty of peace, and that the use of the term “ in amity” in a statute which made the killing of an Indian a crime punishable with death could have meant nothing more or less than that such an act was a crime so long as peace continued. If war should come such an act would not necessarily be criminal.
We come now to several questions of liability, the first of which is, have Congress by the enactment of this statute created a liability on the part of the Government which did not exist before?
The only answer which has been given to this question on the part oí claimants is that Congress by the enactment intended to invest this court with all the discretion to give relief that existed in the legislative bodies.
But as long ago as 1876 it was said in a decision of this court:
“It has been held in previous decisions, and it must now be regarded 'as a fixed principle in this court, that a simple reference of a case by Congress to this court of itself waives no legal defense which the Government as defendant may have, excepting only the statute of limitations. When Congress specially sends a case to be heard and determined here, that enactment probably overrides the existing general enactment that such a case is barred from being brought by lapse of time. There are, indeed, cases where the reference of a claim by Congress to this court may operate as a ratification of a transaction which was in terms made subject to the approval of Congress; but, apart from these two exceptions, it is difficult to conceive of any case where the mere act of referring by enactment will change by implication the law otherwise applicable to the facts of the case. Gmgers Case (11 O. Cls. R., 776, 770).”
There may be cases, as above suggested, where, Congress having referred a specific claim, the assumption of a contingent liability, or- the ratification of a prior transaction, or the waiver of the statute of limitation is a necessary implication, though not expressly stated in the words of the statute. Thus in the Marshall O. Roberts Case (6 C. Gis. ft., 84; 92 U. S., 41) the claimants had expressly agreed with the Postmaster-General that he should incur no departmental liability for an additional mail service, but that it should be rendered subject to the approval and ratification of his principal — that is to say, *343 Congress. The claimants went to Congress asking them to approve the transaction and Congress referred the claim to this court to “ determine and adjudge whether any, and, if any, what amount is due for said additional services.” The claimants had not asserted a liability on the part of the Government, but had asked for one, and it seems manifest that unless the action of Congress ratified and approved the service the statute referring the claim was utterly valueless. Yet even in that case a majority of this court and a minority of the Supreme Court-thought that on general principles such acts should be so construed “as to prevent the entrapping of the Government by fixing a liability when the intent of the legislature might have been only to authorize an investigation.”
Conversely, in the most recent case which presented the question of an implied liability, the decision was adverse to the claimant, Gíimming et al. (22 C. Cls. R., 344; 130 U. S., 452). The statute provided—
“That the claimants be permitted to sue in the Court of Claims, which court Shall pass upon the law and facts as to the liability of the' United States for the acts of its officer, JToshua F. Bailey, by reason of the seizure, detention, and closing up of the commission houses and bonded warehouses of said copartners, for the breaking up and interruption of their said business, and for the seizure and detention of the property, books, and papers in and connected with said business by Joshua F. Bailey, collector of internal revenue tor the fourth internal-revenue district of said State, or by said Bailey and other internal-revenue officers. The United States shall appear to defend against said suit, and either party may appeal.to the Supreme Court as in ordinary cases against the United States in said court; and said suit may be maintained, any statute of limitation to the contrary notwithstanding.”
It is a principle well known to- both lawyers and laymen that the Government is not liable for the tortious acts of its officers, and it seems tolerably clear that if this act did not assume a liability for the wrongful acts of the collector there was none on the part of the Government. In this court it was held, though not without “doubt,” that the legal liability spoken of in the act was “the legal liability which an ordinary body politic, such as a railroad or municipal corporation, would be subject to for similar acts committed by their agents in similar circumstances.” But in the Supreme Court it was held, though by a divided court,, that the statute “ was not a *344 waiver of tlie defense based on tlie general principle of law that the United States are not liable for unauthorized wrongs inflicted on the citizen by their officers while engaged in the discharge of official duties.”
These decisions of the Supreme Court more than sustain all that was said in Gruger (supra), and preclude the judiciary from implying a liability from a jurisdictional statute when none is expressed or where the implication is not inevitable.
' To a certain extent the Indian Depredation Act does assume liabilities. The first jurisdictional clause relates to claims irrespective of statutes and treaties and prescribes the terms and conditions which would render a foreign power liable under the general principles of international law — a depredation by its subjects in time of,peace upon the -property of an American citizen; and a subsequent section directs the court to “determine the value of the property taken or destroyed” and to “render judgment in .favor of the claimant or claimants against the United States” (sec. 5). The second clause, relating to claims which rest upon previous statutes or treaties, leaves the liability as it may have been elsewhere defined; but the subsequent section assumes the liability of the Indians by the United States for the purposes of the suit. In both of these classes of cases there must be a liability on the part of the Indians, known or unknown. In the first, it is a liability growing out of the obligations of international law; in the second, it is a liability resting on statutes and treaties.
It has been urged in argument that a departmental construction has been given to the law since 1872, of which Congress were aware whenthe Indian Depredation Act was passed; that the Secretary of the Interior had again and again examined and approved claims where the depredations were committed in time of war.
If this had been a departmental usage in the true sense of the term, this argument would be one of great weight. If the Interior Department had finally determined and paid such claims during a period of nineteen years, and Congress had again and again appropriated money for satisfying such awards? it might well be said that this act of 1891 was but a continuation of an existing policy. But such was not the fact. The Secretary of the Interior determined nothing. During these nineteen years he was never invested with discretion to pay one *345 such claim; he simply took the place of a committee and investigated. Moreover, his reports were never approved by Congress; for nineteen years they remained unacted upon, which indicates, if it indicates anything, that they w.ere disapproved, and finally the Indian Depredation Act declared that his investigations-“shall cease from the taking effect of this act.” (Sec. 13.) The fact undoubtedly is that Congress were neither satisfied with these investigations nor clear as to the legal rights of the parties, and therefore referred the thousands of cases that had accumulated for the investigation and decision of the judiciary both as to the law and the facts.
It has also been urged that the policy of the United States for a century and more has been to indemnify those who suffered from Indian depredations without attempting to right' their own wrongs and to make the Indians pay, when it can be done, for their misdeeds committed either in peace or war. And it is said that it would be most illogical to so construe the statute that when a few Indians are guilty the' innocent majority of a tribe shall be-charged with the cost of their misdeeds, and that'when all are guilty, all shall escape the consequences of their own acts.
The only policy known to the court is that of maintaining peace. The Government has virtually said, both to the Indians and to its own citizens on the frontier, •“ If you will only refrain from war,, we will see that individual sufferers on either side shall be indemnified for the lawless aggressions of individual criminals of the other.” It is unhappily too well established that these Indian wars too often have been incited or begun by our own people. In this case now before the court the claimant seeks to recover upon these facts narrated in his own evidence:
“A company of volunteers had been quietly organized, and on the 8th day of October, 1855, they struck the first blow on a large band of Indians who professed the utmost friendship to the settlers. Those who survived the slaughter hastened to the reservation, and, persuading the few who were remaining there to join them, commenced their work of retaliation at that point, and then striking down the river continued it in their flight and did it fearfully well.”
To indemnify such persons for losses in such a war would be to give a bounty for the encouragement of Indian hostilities.
*346 The principles of international lawbave been applied to hostilities with the Indian tribes so far as to accord to them the rights of a belligerent. It is too well settled to need citations that an Indian warrior in a war waged within the boundaries of a State can not be tried for murder or robbery in its courts. The international rule which holds a nation responsible for the acts of its members so long as peace continues maybe illogical, but it is world-wide. So Igng as peace continues, the individuals of two nations are supposed to be friends and are held to the obligations of peace. In peace the taking of life, the destruction of property, the imprisonment of the person is unlawful and an offense. When war comes, it becomes lawful to kill, capture, and destroy; and if by the peculiar circumstances of a case such acts are deemed offenses, it is because they are offenses against the laws of war. When war ceases, the conquering power may exact tribute, as Germany did of France or the United States of Mexico; or it may accord peace without imposing terms, as this Government did at the close of' the civil war. But if indemnity is to be exacted, it is as a condition of peace and at the time when peace is established, and not after-wards. The United States at the close of every Indian war have had the power to impose terms, aud confiscate trust binds, and seize territory, and divert annuities. to the indemnification of the Government or of their despoiled qitizens, as they did in the cases of the Sioux and Bogue Biver tribes (supra); but if they did’not exercise the power, and on the contrary allowed a condition of peace and friendship to be restored by a new treaty, or by the tacit revival of a former one, they can not by retroactive legislation, in conditions of peace, arbitrarily cast a responsibility for acts done in a former war upon an Indian tribe. The court will not construe a statute so as to effect a wrong. The law of nations “ defines the rights and prescribes the duties of nations' in their intercourse with each other” (1 Kent’s Com., p. 1); and it, “although not specifically adopted by the Constitution, is essentially a part of the law of the land” (Attorney-General Bandolph, 1 Opin., p. 27). “That the law of nations constitutes a part of the laws of the land- is established from the face of the Constitution upon principle and by authority” (Attorney-General Speed, 11 Opin., p. 299). Inter ■ national law operates in these cases in two ways; it gives to these claimants a right of redress'for depredations upon their *347 property in time of peace, and it gives to these Indian defendants a right to the impartial judgment of a court under the general principles which regulate the affairs of nations.' The question, of course; will be, in each case, where the recovery depends upon the action of the United States when they concluded peace with a warring tribe, whether they asserted a right to indemnity. If the Government did not, the individual suitor can not.
And if this liability can not be cast by implication upon the Indian defendants, still less can the United States be held to respond for the acts and depredations of their enemies. It is one of the evils and misfortunes of war that the losses must be borne by those on whom they fall. There may be elementary writers and framers of international codes who would have it otherwise, and there may be a few trivial, exceptional cases where the losses of individuals have been assumed or shared by the body politic; but with the gigantic illustrations of the civil war still in view it is idle to-speak of any such rule existing in our own time or within this jurisdiction. If there was ever a citizen deserving of indemnity for the destruction of his property it was a truly loyal adherent of the Government in the Southern States during the long and dreary period of the civil war. Yet Congress have steadfastly refused to pay for the destruction of property incidental to military'operations; and it would be a monstrous supposition on the part of the courts that, when this Government has consistently for thirty years refused to indemnify the most deserving of its own citizens for the ravages of war inflicted by its own armies, it was intended by this statute to indemnify these claimants for the acts of a. public enemy.
It is to be understood that upon the question of jurisdiction, i. e., the construction which' should be given to the first, and second jurisdictional clauses of the act, Mr. Justice Davis only concurs in this opinion. The views of the majority of the court are set forth in the preceding case of Leighton. The conclusions in which the court are agreed in this case are as follows:
1. The Indian Depredation Act is jurisdictional; it does not create liabilities, nor assume them further than this, that where a depredation is shown to have been committed by Indians, but their tribe can not be identified-with sufficient *348 certainty to be charged, with the loss, or where a tribe is without funds to satisfy a judgment, the United States assume the Indians’ liability. But the jurisdiction intended by the act is commensurate with and includes all legal liabilities of Indian defendants for depredations committed on citizens.
2. The only liabilities contemplated by the act (.apart from-the above, which are in the nature of guaranties) are those of Indians. The Act 28th February, 1859 (11 Stat. L., p. 388, sec. 8), rescinded all liabilities on the part of the United States.
3. The only liabilities which the judiciary can recognize are those which sprang from treaty stipulations, from the obligations of international law, from the terms and conditions which may have been imposed as a condition of peace at.the termination of an Indian wa.r, or from a statute which prospectively imposed an obligation upon Indian tribes as “ domestic dependent nations.”
4. Where war and not amity was the international condition of the time and the taking or destruction of property was the exercise of a belligerent right, the loss, like the losses of other citizens in other wars, must be borne by him on whom it falls, unless the Indian defendants assumed a liability for war indem-ilities by treaty or it was imposed as a condition to peace. Conversely, the Indian defendants can not set up their own unlawful acts of violence as a defense. To avoid liability they must show, or it m.ust appear, that the depredation was the taking or destruction of property in the exercise of a belligerent’s right to wage war.
5. Where the liability of Indian defendants depends .upon a treaty by which they assumed responsibilities for past or future wars, liabilities not imposed by international law or by statute, the right of the claimant to recover will be measured by the terms, of the treaty.
The judgment of the court is that the petition be dismissed.