Peelle, J.,
delivered the opinion of the court:
The petition herein was filed under the Indian Depredation Act, March 3, 1891 (26 Stat. L., 851; 1 Supp. Rev. Stat., 2d ed., p. 913), to recover the sum of $1,000 for property therein described, alleged to have been taken by the defendant Indians, then in amity with the United States, from one George -A. *280 Garrison, a citizen of the United States, residing in Paulding County in the State of Georgia, since deceased, on or about tbe 1st day of June, 1836, without just cause or provocation on the part of the owner or his agent in charge, and not returned or paid for.
The defendants filed a plea in bar to the action, averring in substance that subsequent to the depredation complained of the defendant Indians entered into a “ treaty with the United States, by the terms of which a general amnesty of all past offenses against the laws of the United States committed by any member of the Greek Nation was declared;” and by a further plea the defendants set forth in extenso article 1 of the treaty of August 31, 1866 (14 Stat. L., 785), in these words: •
“There shall be perpetual peace and friendship between the parties to this treaty, and the Greeks bind themselves to remain firm allies and friends of the United States, and never to take up arms against the United States, but always faithfully to aid in putting down its enemies.
“ They also agree to remain at peace with all other Indian tribes; and,in return, the United States guarantees them quiet possession of their country, and protection against hostilities on the part of other tribes.
“In the event of hostilities, the United States agree that the tribe commencing and prosecuting the same shall, as far as may be practicable, make just reparation therefor.
“To insure this protection, the Greeks agree to a military occupation of their country, at any time, by the United States, and the United States agree to station and continue in said country, from time to time, at its own expense, such force as may be necessary for that purpose.
“A general amnesty of all past offenses against the laws of the United States, committed, by any member of the Greek, Nation, is hereby declared.
“And the Greeks, anxious for the restoration of kind and friendly feelings among themselves, do hereby declare an amnesty for all past offenses against their government, and no Indian or Indians shall be proscribed, or any act of forfeiture or confiscation passed against those who have remainedfriendly to, or taken up arms against, the United States, but they shall enjoy equal privileges with other members of said tribe; and all laws heretofore passed inconsistent herewith are hereby declared inoperative.”
And it is averred that by reason thereof the Greek Indians “were relieved from liability for the depredation which claimants hath alleged.”
*281 To the pleas thus filed the claimants interposed a demurrer.
The question presented, therefore, is as to the sufficiency in law of the pleas in bar.
Both in the oral argument and in the respective briefs of counsel article 22 of the treaty between the United States and the defendant Indians and the Seminole Indians, proclaimed August 28, 1856 (11 Stat. L., 699-705), is referred to and out of caution relied upon by the defendants in support of the pleas, as well as the provision of the treaty of 1866 (supra).
Article 22, trea,ty 1856, is as follows:
“That this convention may conduce, as far as possible, to the restoration and preservation of kind and friendly feelings among the Creeks and Seminóles, a general amnesty of all past offenses committed within their country, either west or east of the Mississippi, is hereby declared.”
This latter treaty, as appears from its preamble, was negotiated for the purpose of settling controversies which had arisen not only between the Creek and Seminole tribes, caused by a previous treaty between them, but also between the United States and the Creek Indians, which latter were persistently urging various claims against the United States.
In furtherance of the objects and purposes of the treaty, article 22, above set out, was inserted.
The claimants contend that inasmuch as the purpose of the article, as therein expressed, was for the “ restoration and preservation of kind and friendly feelings among the Creeks and Seminóles,” the general amnesty therein declared “ of all past offenses committed within their country either west or east of the Mississippi” was intended to apply only as between the tribes, and that the language used is not sufficiently definite and clear to warrant the construction contended for by the defendants.
The general amnesty therein declared is limited by express words to “all past offenses committed within their country either west or east of the Mississippi,” and in this respect differs materially from the provisions of the treaty of 1866.
The language used would seem to justify the interpretation that the tribes, as between themselves, declared a general amnesty of all past offenses committed by the members of either tribe against the other within their country; and perhaps also a general amnesty on the part of the United States *282 of all past offenses committed by the members of either tribe against the laws of the United States within their respective territory.
But we will not stop to inquire as to whether or not- the depredation complained of was committed within the territory of either or whether the court could take judicial knowledge thereof, as the provisions of article 1 of the treaty of 1866, on which the defendants mainly rely, is couched in clear and definite language without limitation or qualification; and we will, therefore, proceed to consider and determine the legal effect thereof in respect of the depredation alleged to have been committed by the defendant Indians June 1, 1836.
As preliminary to this inquiry we will say that during the late civil war the defendant Indians, as set forth in the preamble to the treaty of 1866, entered into a treaty with the so-called Confederate States, thereby ignoring their allegiance to the United States, unsettling treaty relations therewith, and rendering themselves liable to forfeit to the United States the benefits enjoyed by them in lands, in annuities, and of protection, etc. But by a treaty of peace and friendship entered into between them and the United States September 10, 1865, they revoked, canceled, and repudiated their treaty with the so-called Confederate States, at which time the United States, through their commissioner, promised to enter into a treaty with them to “ arrange and settle all questions relating to and growing out of said treaty with the so-called Confederate States.”
Although the treaty of 1866 purports, in the preamble thereto, to have been entered into for the purposes therein set forth, there can be no well-founded contention that the provisions of the treaty are limited thereby, as the function of the preamble was to state only the general objects of the treaty or the reasons therefor; and, like a preamble to a statute, may be consulted perhaps for the purpose of solving ambiguity, or for the purpose of ascertaining the meaning of words when doubt exists'. (Bndlich on Interpretation, etc., secs. 62-66.)
But the language of the treaty “A general amnesty of all past offenses committed by any member of the Creek' Nation against the laws of the United States is hereby declared,” being clear and comprehensive, there is no need, even assuming it to be permissible, to consult the preamble for its meaning.
*283 The claimant contends that inasmuch as the purpose of the treaty was to settle the questions growing out of the defendant Indians’ late treaty relations with the so-called Confederate States, that therefore, although the amnesty granted is couched, in general terms as to all past offenses, it applies only to offenses committed during and growing out of the late civil war. But if this were the only effect of the amnesty so declared, then no more was accomplished thereby than if the treaty had been silent on the subject, as “ amnesty, by the very nature of peace, is necessarily included in it.” (Yattel’s Law of Nations, sec. 20, p.439.)
The language “a general amnesty of all past offenses,” not only includes such offenses as may have been committed during and growing out of the late civil war, but all offenses prior thereto, as the words “all past offenses” clearly mean alL offenses against the laws of the United States committed by any member of the Creek tribe or nation prior to. the execution of the treaty.
Was an offense committed by any member of the Creek Nation prior to the execution of the treaty?
By the Intercourse Act, June 30, 1834, section 17 (4 Stat. L., 731), it is provided in substance that if any Indian or Indians belonging to any tribe in amity with the United States, shall; within the Indian country or in any State or Territory inhabited by citizens of the United States, take, steal, or destroy any property belonging to any citizen or inhabitant of the United States, application for satisfaction was to be made therefor; and it is averred in the petition that June 1,183G, there was taken from the claimant’s decedent, a citizen of the United States, without his consent, by Indians belonging to a band, tribe, or nation known as the Creek Indians, then in amity with the United States, certain x>roperty valued at $1,000, for which it is averred a claim was presented, with evidence therein, to the Commissioner of Indian Affairs.
So that an offense was committed by Indians belonging to the Creek Nation, tribe, or band; and by section 25, act 1834 (supra), the laws of the United States providing for the punishment of crimes committed within the sole and exclusive jurisdiction of the United States included crimes committed within the Indian country, excejff as to “crimes committed by one Indian against the x>erson or proj>erty of another Indian.”
*284 Witli tliis condition of things existing the treaty of 1856, (supra) was entered into, whereby to conduce to the restoration of kind and friendly feelings among the Creeks and Seminóles a general amnesty of all past offenses committed “within their country, either west or east of the Mississippi,”-was declared* The amnesty here declared contained words of limitation, i. e., “ within their country, either west or east of the Mississippi.”
But after the close of the late civil war the United States was not only-desirous of effecting a treaty of peace and friendship with the defendant Indians, and of settling all questions growing out of their treaty relations with the so-called Confederate States, but was desirous of procuring lands upon which to locate other Indians andfreedmen; and for this purpose the defendant Indians, by article 3 of the treaty of 1866, ceded to the United States the west half of their entire domain, amounting to over 3,250,000 acres of land, at 30 cents per acre. This cession followed the “general amnesty of all past offenses against the laws of the United States committed by any member of the Creek Nation.”
It is immaterial for the purposes of this case into which grade or class of offenses the depredation complained of falls, as the word is comprehensive, and includes, says Wharton, “ any crime or act of wickedness. The word is used as a genus, comprehending every crime and misdemeanor, or as a species signifying a crime not indictable, but punishable summarily, or by the forfeiture of a penaltyand the word is similarly defined by Bouvier.
An offense is charged to have been committed against the laws of the United States, i. e., the taking of property from the claimant, a citizen of the United States, without his consent, by Indians belonging to the Creek Nation, then in amity with the United States, of the value of $1,000, on June 1, 1836; and that by reason of such taking a claim accrued in favor of the claimant’s decedent for the value of the property so taken.
So that whatever legal right or claim may have existed against the defendant Indians in favor of the claimant’s decedent, aside from any claim which may have arisen under international law, was by virtue of a law of the United States, i. e., the act of 1834; but no remedy was given in any court to enforce payment, or even to secure satisfaction, except by *285 means of an investigation through the medium of the Executive Department; and if treated as a claim arising under international law the claimant had no power of enforcing payment except through the United States.
Whether or not the defendant Indians could have been prosecuted and punished for the offense at the time of the execution of the treaties, or whether the claim was then a valid and subsisting one against them, is not material here, for if the legal effect of the amnesty was to blot out the offense, if punishable, it would also blot out the possibility of exacting a penalty for an offense barred by time or by statute.
It is a well-settled rule of construction that treaties must be interpreted as they are understood by the parties at the time; and as to treaties with the Indian tribes it is well settled that favorable rules of interpretation should be applied, or, as was said by Justice Washington in a concurring opinion in the case of Worcester v. Georgia (6 Pet., 582), “The language used in treaties with the Indians should never be construed to their prejudice.”
What, then, was intended by the general amnesty so declared in the treaty of 1866, and, as preliminary to this, what is amnesty? Yattel’s Law of Nations, page 439, thus defines it:
“An amnesty is a perfect oblivion of the past; and the end of peace being to extinguish all subjects of discord, this should be the leading article of the treaty; and accordingly such is at present the constant practice. But though the treaty should be wholly silent on this head, the amnesty, by the very nature of peace, is necessarily implied in it. * * * All damages caused during the war are likewise buried in oblivion, and no action can be brought for those of which the treaty does not stipulate the reparation. They are considered as having never happened.”
There is no stipulation in the treaty in the case at bar for reparation for any damage done by the defendant Indians to any citizen.-
The Century Dictionary defines amnesty:
“A forgetting or overlooking; an act of oblivion; specific-, ally, a general pardon or conditional offer of pardon of offenses or of a class of offenses against the Government.”
Bouvier says:
“Amnesty and pardon are very different. The former is an act of the sovereign power, the object of which is to efface *286 and cause to be forgotten a crime or misdemeanor; the latter is an act of the same authority which exempts the individual on whom it is bestowed from the punishment the law inflicts for the crime he has committed. Amnesty is the abolition and forgetfulness of the offense; pardon is forgiveness. A pardon is given to one who is certainly guilty, or who has been convicted; amnesty to those who may have been so.
“Their effects are also different. That of pardon is a remission of a whole or a x>art of the punishment awarded by the law — the conviction remaining in effect when only a partial pardon is granted; amnesty, on the contrary, has the effect of destroying the criminal act, so that it is as if it had not been committed, as far as the public interests are concerned.”
Wharton defines amnesty:
“The act of p>ardon or oblivion by which crimes against the Government up to a certain date are so obliterated that they can never be brought into charge.’”
By the terms of the amnesty, “all past offenses” means all offenses up to the date of the execution of the treaty.
Abbott’s Law Dictionary:
“Amnesty differs from x>ardon in being more general; it extinguishes the offense as to all xiarticrpators, while pardon exonerates the individual from a punishment he has incurred. Amnesty is rather a political decision that acts that might by their motive and effect be treated as crimes shall not, for reasons of state policy, be so considered.”
The definitions of amnesty as thus given are in harmony with each other, and are sustained by judicial interx>retation.
In speaking of the effect of a pardon by the President (whose power in this resxiect is unlimited except in cases of iitqjeacliment), in the case of Ex parte Garland (4 Wall., 333-380), the court says:
“A x>ardon reaches both the punishment prescribed for the offense and the guilt of the offender; and when the pardon is full it releases the xranishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. If granted before conviction it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and cajiacity. There is only this limitation to its ox>efiation: it does not restore offices forfeited, or juoperty or interests vested in others in consequence of the conviction and judgment.”
*287 In this case the court held, the pardon being a full pardon, that “to exclude him, by reason of that offense, from continuing in the enjoyment of a previously acquired right is to enforce a punishment for that offense, notwithstanding the pardon.”
In United States v. Padelford (9 Wall., 531-543), where a pardon had been granted by the President, the court held that the petitioner, by reason of the pardon, “ was purged of whatever offense against the laws of the United States he had committed by the acts mentioned in the findings and relieved from any penalty which he might have incurred.”
This was followed by the decision in the Klein Case (13 Wall., 128), where it was said: “Pardon includes amnesty; it blots out the offense pardoned and removes all its penal consequences.”
To the same effect also is the decision in the Armstrong Case (Id., 154), where it was said: “The proclamation of the 25th .December granted pardon unconditionally and without reservation. This was a public act of which all courts of the United States are bound to take notice and to which all courts are bound to give effect.”
From these decisions we conclude that the “general amnesty of all past offenses against the laws of the United States, committed by any member of the Creek Nation,” as set forth in the treaty of 1866, blotted out the offense, “so that in the eye of the law the offender is as innocent as if he had never committed the offense.”
If, therefore, the offense out of which the claim grew is' blotted out and forgotten, how stands the claim of the citizen for the injury done him in the taking of his property?
Although the act 1834, in respect of the depredation committed by Indians belonging to any tribe in amity with the United States, ‘ created a liability against such tribe and guaranteed indemnity for the value of the property so taken or destroyed out of any annuity going to them from the United States, still there can be no successful contention that the claimant had acquired any vested right of property in such unliquidated claim. He had no contract rights. His claim had not even gone to an award by an Executive Department.
Whatever legal rights he had were acquired by virtue of the act of 1834 against the defendant Indians as a tribe or nation, *288 and were therefore different from an ordinary claim between individuals, where their legal rights are fixed and the courts are open to them for the redress of their grievances and the enforcement of such rights.
Certainly the United States, a sovereign, acting through their political departments in the negotiation and execution of the treaty with a “domestic dependent nation,” did not intend by the language used simply to relieve the defendant Indians from any penalties which might have accrued to the United States, leaving the citizen to pursue them, aided by the United States, for the purpose of securing damages for the property the taking of which constituted the offense which the amnesty blotted out.
To do this, in view of the general amnesty of all past offenses against the laws of the United States, would, in our opinion, be an act of bad faith on the part of the United States, especially as at the time of the execution of the treaties the only legal right the claimant had against the defendant Indians was by virtue of a law of the United States; and the defendant Indians well knew that no claim against them for depredations could or would be prosecuted against them or satisfaction sought except with the consent of and through the United States.
The United States having by the solemnities of a treaty for ample consideration, if that were necessary, granted general amnesty to the defendant Indians for all past offenses, thereby relieving them from any and all penalties which had accrued by reason of the offense, and restored them to a condition of innocence, as though the offense had never been committed, have so blotted out the offense as to relieve them from all the legal consequences thereof, including the payment of damages to the claimants for the property so taken.
At the date of the depredation or offense complained of the United States, by the provisions of the act of 1834, section 17, guaranteed to the party injured eventual indemnification; and while by the Act of February 28, 1859 (11 Stat. L., 401), this provision or guaranty was repealed, yet by the Joint Resolution of June 25, 1860 (12 Stat. L., 120), it was provided that the repealing act “ shall not be construed to destroy or impair any right to indemnity which existed at the date of said repeal.”
*289 So that if tbe claimant filed his claim within the time and in the manner provided by that section he has preserved whatever rights he had against the United States under the provisions thereof. But what such rights were or are as against the United States we need not now decide, as under the Jurisdictional Act of March 3, 1891 (supra), no judgment can be rendered against the United States except jointly with the defendant Indians, they being identified' by averment in the petition as having committed the depredation.
Under section 5 of the act of 1891 the court can not render judgment against the United States alone when the Indians committing the depredation have been identified, as by the claimants’ averments in their petition in ¿¡his case they have been.
In the Love and Leighton Cases (29 C. Cls. R., 332 and 288) the court held that the act of 1891 created no new liability against the Indians, and that the United States assumed jointly with the Indians, when they could be identified, only existing liability.
In other words, the act of 1891 is a remedial statute, whereby only existing claims against the Indians may be prosecuted to final judgment in this court.
And whether or not a judgment can be rendered against the United States, either jointly or alone, depends upon the citizenship of the claimant, the amity of the tribe, band, or nation to which the depredating Indians belonged at the time of the depredation, and whether or not the'defendant Indians, known or unknown, are liable fo'r the depredation complained of.
From what we have said it follows that judgment can not be rendered in the case at bar against the United States and the defendant Indians, or either, and the claimant’s demurrer to the pleas in bar must therefore be overruled, which is accordingly done.