Howry, J.,
delivered the opinion of the court:
This action was instituted under the act providing for the adjudication and payment of claims arising from the depredation of Indians (26 Stat. L., 851). That act is jurisdictional only, and relates to claims which had arisen under existing laws and treaty stipulations at the time of its passage. (Love v. United States, 29 C. Cls. R., 332.)
There is no provision' in the act which excludes a citizen from recovery for merely being in the Indian country. But the right to be there was made material under the seventeenth section of the act of June 30,1834 (4 Stat. L., 429), and that act, notwithstanding the repeal of most of its provisions, must be taken to indicate what is meant by Indian country in subsequent statutes where the expression is used. So, if the place of depredation was in Indian country, and the injured party was unlawfully there, the plaintiff can not recover.
In several cases relating to Indian country the depredation appears to have been restricted to a reservation set apart by treaty, Executive order, or act of Congress for the sole use and occupation of Indians. ( Welch, admr., v. Cherokees et al., 32 C. Cls. R., 106; Janis v. Sioux et al., 32 ibid., 407.)
After the allowance of many claims by the Indian Office under the direction of the Secretary of the Interior preceding the jurisdictional act of March 3, 1891, and more than ten years of litigation under the act of our jurisdiction, resulting-in numerous judgments against the defendants (cases in the meantime having been taken to the Supreme Court, where the defense now made might have been interposed), this is the first time in the history of depredation claims the court is called upon to determine whether the country acquired by the treaty of Guadeloupe Hidalgo was Indian country before the assignment of reservations to the tribes of that region.
A country inhabited by Indians does not necessarily make such country Indian country within the meaning of the statutes. The status of such country must be determined with reference to the aboriginal claim arising from occupation and the recognition given by the Government to the right accompanying the possession.
*458 The' act of June 30, 1834 (supra), provides:
“That all that part of the United States west of the Mississippi, and not within the States of Missouri and Louisiana, or the Territory of Arkansas, and also that part of the United States east of the Mississippi River, but not within any State to which the Indian title has not been extinguished, be taken and admitted to be Indian country.”
In American Fur Co. v. United States (2 Pet., 358), g-oods were seized for having been introduced into Indian country in violation of the act of 1802, upon which the act of 1834 was founded. It was held that if by treaty made with Indians after the passage of that act their title to the region where the offense was committed had been extinguished it ceased to be Indian country, and the statute was without application.
In United States v. Forty-three Gallons of Whisky (93 U. S., 188) it was held that the region ceased to be Indian country when the Indian title was extinguished, and not until then, though the soil was within the boundaries of a State, unless some reservation took it out of the rule.
In United States v. Joseph (94 U. S., 614) it was held that' the act of 1834 applied to those semi-independent tribes whom our Government always recognized as exempt from our laws whether within or without the limits of an organized State or Territory, and in whom we recognized the capacity to make treaties.
In Bates v. Clark (95 U. S., 204), where a lot of whisky appears to have been seized in the then Territory of Dakota on the ground that the place of seizure was Indian country, it was held that the seizure was unlawful. Referring to the act the court said:
“All the country described by the act of 1834 as Indian country remains Indian country so long as the Indians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision bjr treaty or by act of Congress.”
In the case of Ex parte Crow Dog (109 U. S., 556) the definition was applied to all the country to which the Indian title had not been extinguished within the limits of the United States, aside from reservations, “although much of it had been acquired since the act of 1834.”
*459 The court adds in this case:
“ From the foregoing decisions it follows that all the country described by the act of 1834 as. Indian country remains Indian country so long as the Indians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision by treaty or by act of Congress.”
The depredation was committed in a section of Colorado, forming, at the time of the offense, a part of New Mexico, and included in territory subsequently set apart by the second article of the second treatjT with certain Utahs. New Mexico was then a separate Territory. California had previously been admitted to the Union. All this country originally belonged to Spain but had been wrested from that kingdom by Mexico, and in turn came under the sovereignty of the United States bjr virtue of the treaty of Guadalupe Hidalgo. That treaty included California from the forty-second degree of north latitude down to the thirty-second degree. Scattered along the Pacific coast for 10 degrees were settlements, trading posts, and villages; but back of these, to the confines of that civilization which the whites had advanced across the Mississippi at the time of the treaty, lay a vast wilderness inhabited by Mexicans, with the right, by the terms of the treaty, to remain and to become citizens of the United States, and by a class of people called Pueblos and Mission Indians, besides wild tribes composed1 of Navajos, Apaches, and Utahs. This region rapidly filled with explorers, adventurers, and squatters from settlements east of the Mississippi, and was understood to be open to immigration. Upon its acquisition treaties were made with various resident tribes, and statutes were enacted for the government of the country, pending the time when the provisional or military governments were in control. By the act of September 9, 1850 (9 Stat. L., 452), the Constitution and laws of the United States not locally inapplicable were extended to the Territory of New Mexico, as a proclamation to that effect should be Issued under section 18 of that act. And by section 7 of the act of July 27, 1851 (9 Stat. L., 587), it was enacted—
“ That all laws now in force regulating trade and intercourse writh the Indian tribes, or such provisions of the same *460 as may bo applicable, shall be, and the same are hereby, extended over the Indian tribes in the Territories of New Mexico and Utah.”
The extension of the trade and intercourse laws over the Indians in New Mexico and Utah and the treaties with the tribes there did not have the effect to make those Territories Indian country. There were too manj^ persons there who had elected to remain and become citizens of the United States under our ti’eaty with Mexico, and too many Americans going there for trade and business, and too many Pueblos engaged in peaceful agricultural pursuits to lead us to believe that Congress intended by the mere extension of a police regulation affecting trade and intercourse with the resident savages to thereby declare the whole of the newly acquired territory to be Indian country while the savage tribes were inhabiting but a small part of the ceded territory. Thus it has been held that Nevada was not Indian country by virtue of the intercourse law of 1834. (United States v. Leathers, 6 Sawy.,
17; United States v. Tom, 1 Or., 26; United States v. Seveloff., 2 Sawy., 311.) Neither was California nor Utah.
It is said for defendants that Spain never recognized Indian titles except those of the Cherokee, Seminole, and others in Florida and the southern possessions of that Kingdom in this country, and that as to this country the grant from the Indians was always the grant of the fee; that the King of Spain made no concessions respecting Indian titles in Mexico, but claimed the whole country for his own; that this claim by virtue of conquest was maintained until Mexico acquired its independence and that Government in turn never acknowledged the existence of aboriginal title. The significance of the proposition is that if the Indian title to occupancy was never recognized by Spain and Mexico the title acquired by the United States was obtained free of incumbrance by virtue of previous Indian occupancy. In other words, the contention is that there was no Indian title to extinguish when the former sovereigns lost control.
There are authorities which hold that the Spanish law did not recognize any kind of title to the soil growing out of occupation in wild or wandering tribes (Byrne v. Alas, 74 Cal., 628), and that the uncivilized Indian was as free from being *461 considered, in the laws of Spain and Mexico as the wild beast of the forest (United States v. Lucero, 1 New Mex., 422).
The rule was stated very early that Indians were deemed to be the rightful occupants of the soil with a legal as well as just claim to retain possession and use it at discretion. The nations asserted ultimate dominion with power to convey a title to the grantees, but every grant was subject to the Indian right of occupancy. Spain did not rest her title solely on the grant of the Pope, but based her claim upon the right of discovery. (Johnson v. McIntosh, 8 Wheat., 575.) This qualified claim of title by virtue of discovery seems to have included the acquisitions of Spain from Old Mexico because the aboriginal right of occupation was respected by the laws of Spain, but the occupants could not part with this right except in the mode pointed out by Spain. (Chouteaux. Moloney, 16 How., 201; Mitchell v. United States, 9 Pet., 724.) So much for Spain.
But as for Mexico, neither the researches of counsel nor the investigations of the court disclose recognition of aboriginal title by that Government. When the independence of Mexico was established in 1821 the revolutionary government adopted a decree known as the “Plan of Iguala.” This plan was reaffirmed by the treaty of Cordova and its principles were adopted by the Mexican Congress under enactments in 1822 and 1823. By this plan it was declared that “All the inhabitants of New Spain, without distinction, whether Europeans, Africans, or Indians,' are citizens of this Monarchy, with a right to be employed in any post, according to their merit and virtues.” Under these declarations the civilized Indians of Mexico have enjoyed political rights. And it is interesting to note in this connection that Juarez, who came to the presidency of the Mexican Republic, was a full-blooded Indian. So far as the wild tribes are concerned they do not seem to have had reservations set apart to them, but they remained in Mexico without molestation because no doubt they were too numerous to be expelled and yet too uncivilized to be incorporated in the body politic.
No account seems to have been taken of them in the settlement schemes of Mexico. By the first colonization law there it was provided “ that the lands of the Government which are *462 .not the property of any individual, corporation, or town are the subject of the Lot and may be colonized.” (Sec. 27, Law of 1824, Rockwell’s Span, and Mex. Law, 451; United Staten v. Ballejos, 1 Black, 541.) In Chihuahua, where the Apaches, Ute, and Navajo Indians resided, colonization was provided for a large portion-, if not all, of what now comprises New Mexico and Colorado. This was in 1825, and no reference was then made to Indian titles. (Rejniolds’s Span, and Mex. Laws,132.) So, in the colonization scheme provided by Sonora, it appears that ‘4 there are eolonizable in the State all the desert and vacant lands on its frontiers which belong to it and are not the property of an individual, corporation, or town.” (Ibid., 296.)
The Supreme Court of the United States has taken judicial notice of the status of the civilized Indians in New Mexico. (United States v. Ritchie, 17 How., 156; United States v. Joseph, supra.) But the status of the uncivilized tribes was not considered in those cases.
The right to remove Indians from any portion of the ceded territory was recognized' by the twelfth article of the treaty of Guadalupe Hidalgo. (9 Stat. L., 930.) By a treaty made between the United States and the Navajos those Indians came under the exclusive jurisdiction and protection of the United States, and the laws regulating trade and intercourse with the United States were extended over the Navajo country. A similar treaty with the Utahs was likewise proclaimed September 9, 1850. (9 Stat. L., 984.) By its fourth article the territory occupied by the Utahs was annexed to New Mexico and the trade and intercourse laws extended over them. Free passage through territory occupied by them was provided for, and there was a stipulation to the effect that the United States should at their earliest convenience designate,-settle, and adjust the territorial boundaries of the tribe; but in the meantime, by article 7, the tribe was not permitted to depart from their “accustomed homes” unless specifically permitted, and the Utahs agreed to confine themselves strictly to such limits as might thereafter be assigned to them by the United States. There was neither recognition of title in the soil nor was there denial of any such claim, if any existed. Apparently the promise to fix boundaries was left open to be claimed as a right *463 by the one party or to be fixed as a matter óf grace by the other.
By the treaty of October 7, 1863 (13 Stat. L., 673) with the Tabeguacho band of Indians — the same who committed this depredation — a definite claim was asserted, as appears from the preamble, to wit:
“Whereas the Tabeguache band of Utah Indians claim an exclusive right to the following-described country as their lands and hunting grounds within the territory of the United States of America, being bounded and described as follows, to wit: Beginning on the thirty-seventh degree of north latitude,” etc.
But the Senate of the United States inserted an amendment after the word “claim,”, so as to make the same read, “As against all other Indian tribes.” Another amendment provided that nothing contained in the treaty should be construed or taken to admit on the part of the United States any other or greater title or-interest in the lands excepted and reserved in said tribe or band of Indians than existed in them on the acquisition of said territory from Mexico by the laws thereof.
Under an act entitled “An act to vacate and sell the present Indian reservations in Utah Territory and to settle the Indians of said Territory in the Uinta Valley,” approved May 5, 1864 (13 Stat. L., 63), Congress required the special reservations theretofore made or occupied as such in Utah, excepting Uinta Valley, to be surveyed into tracts so that all or as many of the Indians there as practicable should be removed to the valley, which by the act was set apart for the permanent settlement of such of the different tribes of Utah as might be induced to occupy the same. The act of February 23, 1865 (13 Stat. L., 432), relates to the lands described in the act of 1864, as far as we are able to determine.
The lands mentioned in the act of May 5, 1864, were restored to the public domain by a subsequent act approved June 18, 1878. (20 Stat. L., 165.)
.By the treaty of 1868 the United States fixed the boundaries of the country of the other Utahs. By this treaty seven bands relinquished all claims and rights in and to any portion of the United States not embraced in reservations defined by the treaty. (15 Stat. L., 620.)
*464 Considering that by the first treaty with the Tabeguache band rights of occupancy were left indeterminate, that by the next agreement the treaty-ratifying power declined to recog'-nize the Utahs as possessing any primary title, but expressly refused to admit any other or greater title or interest in the lands excepted and reserved to the tribe than existed iii them on the acquisition of the country from Mexico by the laws thereof, it does not sufficiently appear that the depredating tribe was occupying country to which they had a possessor}' right and title at the time of this depredation. The rule fixed by the political department of the Government in such a matter must be the rule to be followed by the judicial department. There was no special country set apart for the use of the Utahs before the treaty of 1863, and that treaty must bo viewed as giving the band a country — limited by reservation boundaries — never before possessed by this band. It became Indian country when the United States set apart a reservation, and not until then, and to the extent of the reservations assigned to them only. The court must conform its will to that of the parties. If they did not stipulate for boundaries and an Indian country within limits at the outset, it is not the province of the court to define the limits of such a country now.
■ No definition of Ute country appears prior to this treaty of 1863. The lands then assigned did not extend south of the thirty-seventh degree of north latitude, which was the southern boundary of Colorado. Title then, as it already appears, to lands north of that parallel was recognized in favor of that aboriginal band “ as against all other Indian tribes,” but not admitted as against the United States. None of the tnbes acquired with the cession of territory under the treaty of Guadalupe Hidalgo have ever been called upon to surrender any part of the country inhabited by them except the Tabeguache band. All but this band were removed at the pleasure of the Government. Nothing is disclosed by the record to establish any higher or greater title in this inconsiderable band than- existed in the other Utahs, the various tribes of Apaches, and the Navajos.
We are constrained to hold that with the acquisition of territory from Mexico the treaty-making power intended to *465 Americanize the ceded territory and that the doors were not opened by the political department of the Government for Indians to commit depredations on the people who were there or upon those who might go there. The only rational view to take of the matter is that that country became Indian country only where the Indians had the exclusive right of occupancy. The defendant Indians did not have that right at the time of the commission of this depredation. Plaintiff’s intestate was lawfully there. Not being a tresspasser, and offering no provocation, the depredation constituted an offense. The defendant Indians were in a condition of amity, and being within the jurisdiction of the United States they became liable. (Lowe v. United States, 37 C. Cls. R., 413.)
Defendants’ motion for a new trial is overruled. As the findings upon which the original judgment was rendered pertain generally to the Utah Indians, the judgment is vacated and set aside, and amended findings to conform to the amended petition substituting the Tabeguache band of the Utah tribe as the proper defendants will be filed and judgment entered thereon for $345 in favor of the plaintiff.
Wright, J., had not qualified when this cause was reargued, and took no part in the decision.