Davis, J.,
delivered the opinion of the court:
The petition in this case avers that the plaintiff is a “ company chartered under the laws of the State of Colorado and *343 doing- business m the state of Chihuahua, county of G-alena, Republic of Mexico;'' that “ at the time the grievances hereinafter described were committed * * * your petitioners were citizens of the United States and resided in the city of New York.” .
The petition then alleges the ownership of certain property stated to have been stolen- by Indians who “were located at that time in the Territory of New Mexico and Arizona,” and which (after the theft) was taken into the United States. The substance of the petition (so far as important at this time) is that Indians from the United States stole plaintiff’s property in Mexico and took it from Mexico into the United States.
To this petition defendants plead in bar: “Because the depredation complained of is alleged to have occurred in the Republic of Mexico, beyond the jurisdiction of the United States and courts thereof, and that this court has not jurisdiction to entertain this suit.”
Plaintiff demurs to this plea.
The proposition presented by the petition is thus stated: “ That the United States shall make restitution to the claimant company for the taking of its property on Mexican soil by Indians who sustained tribal relations with the United States;” further that this court has jurisdiction to enter judgment for this loss against the United States and the defendant Indians.
The statute under which the claim is presented (26 Stat. L., p. 851) confers authority “ to inquire into and Anally adjudicate” all claims of certain classes. The first class is the only one important to our present purpose. It is thus defined: “All claims for property of citizens of the United States taken or destroyed by Indians belonging to any band, tribe, or nation m amity with the United States, without just cause or provocation on the part of the owner or agent in charge, and not returned or paid for.”
Therefore the plaintiff must be a citizen of the United States; his property must have been taken or destroyed by Indians, and the band or tribe to which the Indians belonged must have been, at the time, in amity with the United States.
There is in the act no limitation in terms as to the place of taking or destruction. Why should there be? The general principle of law is that the statutes of a country do not run beyond its territorial jurisdiction except upon its merchant vessels upon the high seas, usually upon the vessels of its *344 navy, and in some cases (provided for by treaty) upon merchant vessels and citizens within the jurisdiction of the few countries where the privilege of “ extraterritoriality ” exists. None of these exceptions attach to the Eepublic of Mexico; her rights in the family of nations are equal to those of any other power; her duties and responsibilities are the same. The United States (unless for some express agreement between the two nations) may not discipline or control Indian tribes within the Mexican territory, and, being without power to enter that territory in time of peace without Mexico’s consent, is without direct responsibility for what may there occur. Wrongs sustained by a citizen of the United States while in Mexico can only be remedied through the executive branch of the Government and do not present causes of action in the courts. If citizens of the United States resort to Mexico, they may expect and their Government may demand for them equality of safety and protection with the citizens of that country, an unbiased administration of the laws in relation to them and their property, and any special advantages (if such there happen to be) expressly reserved by treaty. Beyond this there is no right.
It is not alleged that this plaintiff was subjected to any loss other than that which occurred at the hands of Indians within the territorial jurisdiction of Mexico; to remedy that loss he must resort to the Mexican courts, if the law of that Eepublic happen to provide a remedy through its judiciary for such misfortunes. Failing that, an appeal might possibly be made upon the Mexican Government through the executive department of the Government of the United States, if the facts so authorize and that department deem such an appeal advisable and wise. In any event, the matter in dispute does not fall within the jurisdiction of this court.
This conclusion, drawn from the laws governing the responsibilities of nations to each other, and the limitation of the territorial responsibility of any nation, is in this instance absolutely enforced by the statute of 1891, giving this court jurisdiction over Indian depredation cases. This act is purely remedial in its nature; it provides a forum where certain alleged rights may be litigated, but it creates no rights except in so far as it imposes a liability upon the United States for plaintiff’s benefit. To find the wrongs which it hopes to remedy we must turn to the act of 1834; so long have these con *345 tentions been before the G-overnment, in some one or more of its three branches.- (Act of June 30,1834; 4 Stat. L., 731, sec. 17.) In this act it is jmovidecl in substance:
“That if any Indian or Indians belonging to any tribe in amity with the United States shall, within the Indian country, take or destroy the property of any person lawfully within such country, or shall pass from the Indian country into any State or Territory inhabited by citizens of the United States,, and there take, steal, or destroy any * * * property belonging to any citizen or inhabitant of the United States, such citizen or inhabitant * * * may make application to the proper * * * agent, * * * who, upon being furnished with the necessary documents and proofs, shall, under the direction of the President, make application to the nation or tribe to which said Indian or Indians shall belong for satisfaction; and if such nation or tribe shall neglect or refuse to make satisfaction in a reasonable time, not exceeding twelve months, it shall be the duty of such * * * agent * * * to make return of his doings to the Commissioner of Indian Affairs, that such further steps may be taken as shall be proper, in the opinion of the President, to obtain satisfaction for the injury; and in the meantime, in respect to the property so taken, stolen, or destroyed, the United States guarantee to the party so injured an eventual indemnification: .Provided, That if such injured party * * * shall in any way violate any of the provisions of this act by seeking or attempting to obtain private satisfaction or revenge he shall forfeit all claim upon the United States for such indemnification.”
We have held (Leighton v. The United States, 29 O. Cls. R., p. 288) “the claim in every case, under the act of 1834, arose from the taking or destruction of the property of a citizen or an inhabitant by Indians belonging to some tribe in amity with the United States, and no rights, other than the mere right of having claims investigated, have been given to claimants except under and by virtue of that general act, unless other-rights accrued by reason of treaty obligations.”
Every claim here pending under the remedial statute of 1891 must turn back to the statute of 1834 to establish a right of recovery. This act limits the claims to those arising from depredations committed by “ any Indian or Indians belonging to any tribe in amity with the United States,” and fixes the place of loss as “within the Indian country,” or any “State or Territory inhabited by citizens of the United States.” The purpose of the act is thus defined in the title, “An act to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontiers.” The first section provides “that *346 all that part of the United States west of the Mississippi, and not within the States of Missouri and Louisiana or the Territory of Arkansas, and also that part of the United States east of the Mississippi Eiver, and not within any State to which the Indian title lias not been extinguished, for the purposes of this act, be taken and deemed to be the Indian country.” Here we g'et the official definition of the oft-recurring' phrase “the Indian country.”
The act then provides for a license to trade with the tribes “in the Indian country,” to be issued by “a superintendent of Indian affairs, or Indian agent, or subagent,” the applicant to give bond that he will “faithfully observe all the laws aud regulations made for the government of trade and intercourse with the Indian tribes, and in no respect violate the same.” The superintendent of the district is authorized to revoke these licenses “whenever the person licensed shall, in his opinion, have transgressed any of the laws or regulations provided for the government of trade and intercourse with the Indian tribes, or that it would be improper to permit him to remain in the Indian country.” The act prohibits trade within the Indian boundaries except under certain conditions. It empowers the agent to refuse licenses, subject to an appeal to the Commissioner of Indian Affairs. It authorizes the President to prohibit the introduction of goods into the Indian country, to revoke licenses to trade with any Indian tribe, and to prohibit trade with them. It directs that licenses shall only be granted to citizens of the United States, and it makes “ a foreigner” subject to punishment if he remain in the “Indian country” without the prescribed jiermissiou.
Section 18 authorizes superintendents, agents, and subagents, within their respective districts, to take depositions and to administer oaths. Section 19 authorizes the superintendents, agents, and subagents to endeavor to procure the arrest and trial of all Indians accused of committing any crime, offense, or misdemeanor, and all other persons who may have committed crimes or offenses within any State or Territory and have fled into the Indian country, either by demanding the same of the chiefs of the proper tribe, or by such other means as the President may authorize; and the President may direct the military force of the United States to be employed in the apprehension of such Indians, and also in preventing or terminating hostilities between any of the Indian tribes.
*347 Sections 20 and 21 control tbe sale of spirits, section 23 authorizes the employment of the military forces of the United State's in apprehension of certain persons in the “Indian country,” section 25 extends the criminal laws of the United States to the “Indian country.” Section 16 of the act provides, that where in the Indian country a white person, in the commission “of any crime, offense, or misdemeanor,” shall injure the property of any friendly Indian he shall pay to the Indian twice the value of the property, and if unable to pay, then the United States shall pay, provided the Indian or any of his nation have not sought private revenge or “attempted to obtain satisfaction by any force or violence.”
Other citations are unnecessary. The act in all its parts is harmonious and every section shows clearly that Congress were legislating only for Indian tribes within the territorial jurisdiction of the United States. It is impossible to assume that the Congress would attempt to make such detailed regulations as to Indians outside the United States, either in Mexico or Canada, or attempt to prescribe the method of enforcement in those countries of a statute of the United States or assume, in these foreign jurisdictions, to provide officers to superintend that enforcement within those friendly nations.
What is understood in the Department of the Interior as the Indian country is well shown in the following letter from the honorable the Secretary of the Interior:
“DEPARTMENT OP THE INTERIOR,
■ “ Washington, D. 0., May 1, 1879.
“The honorable the Secretary op War:
“ Sir : I am in receipt of your request of the 30th ultimo for a reference to the laws and statutes of the Uiiited States which declare the Indian Territory under its present boundaries ‘Indian country,’ so as to subject it to the intercourse laws and make it lawful to expel intruders therefrom by military force, if necessary, under section 2147 of the Eevised Statutes.
“The whole of this territory was included in the statute of March 30,1802, declaring what portion of the United States shall be deemed Indian country, which was reenacted in term's by the first section of the act of June 30,1834. (Stats. 4, p. 729.)
“The intervening act of May 28, 1830, authorized the President of the United States to cause so much of any territory west of the Mississippi, not included in any State or organized Territory, as he might judge to be necessary to be set off and divided into districts for the reception of Indian tribes. This territory was especially selected and reserved by the Executive for the purposes prescribed, and has ever since been *348 known and organized as the 'Indian country/ no States or Territories having been created therein. In the meantime, by treaty of May 6,1828 (article 2, Stats. 7, p. 311), which was reaffirmed by the treaty of December 28,1835 (Stats. 7, p. 479), the United States ceded to the Cherokee Nation what is now known as the Cherokee country in said Territory, and the jurisdiction of which is still retained by said nation under treaty of July 19,1866 (Stats. 14, p. 799, art. 16), although a large portion of said lands are located by other Indians under the provisions of the latter treaty.
“ The next cession in order of time was made to the Creek Nation by treaty of February 14, 1833. (Stats. 7, p. 417, art. 21.) This tract was situated immediately south of the Cherokee lands, extending westward to the Mexican boundary. Next came the Choctaw and* Chickasaw cession of June 22, 1855 (Stats. 11, p. 611), by which the residue of what is now the Indian Territory was ceded to those tribes.”
The claim, therefore, does not fall within our jurisdiction, either under the broad principles of national or international responsibility, or under the jurisdiction expressly granted by the act of 1891 as interpreted by the act of 1834.
Plaintiff’s demurrer to plea in bar overruled. Plea in bar sustained. Petition dismissed.