Peelle, J.,
delivered the opinion of the court:
The question of the citizenship of the claimant’s decedent at the time one of the depredations set forth in the petition was committed was presented to the court at the last term by the defendants’, motion for a new trial and decided adversely to the claimants. (36 C. Cls. R., 407.) Upon the recent trial of the case the question wras again presented to the court by an elaborate argument, in which a new ground was set up by claimants’ counsel. That ground was that the claimants’ decedent was born in 1809 in the Mexican province of New *490 Mexico, then within the limits of the Louisiana purchase. It was contended that the place of his birth was then territory of the United States, and that by virtue of his birth in such territory he was and ever since has continued to be a citizen of the United States.
It is conceded by the parties to this action that the claimants’ decedent, Antonio Sandoval, was born of Spanish parentage in the town of Santa Fe, east of the Rio Grande River, in the Territory of New Mexico, in the year 1809, and that he continued to reside in said Territory east of the Rio Grande until his death, in 1862.
The claimants’ contention is that at the time of the birth of said Sandoval the Territory of New Mexico east of the Rio Grande was owned b3r the United States by virtue of their treaty with France of April 30, 1803, and so continued territory of the United States until their treaty with Spain in 1819.
The territory known under the name of Louisiana, including the island of New Orleans, was ceded to the King of Spain by France in 1762, but in October, 1800, as recited in Article I of the treaty of 1803, the same territory was retroceded to France under the name of “the colonyor province of Louisiana, with the same extent that it now has in the hands of Spain and that it had when France possessed it, and such as it should be under the treaties subsequent^ entered into between Spain and other States.” (8 Stat. L., 200.)
So that whatever territory France originally possessed she acquired by the retrocession; and by the treaty of 1803, aforesaid, between the United States and the French Republic, after reciting in the first article the terms of the retro-cession from Spain to France of “the colony or province of Louisiana,” it is provided:
“And whereas, in pursuance of the treaty,.and particularly of the third article, the French Republic has an indisputable title to the domain and to the possession of the said territory: The First Consul of the French Republic, desiring to give to the United States a strong proof of its friendship, doth hereby cede to the United States, in the name of the French Republic, forever and in full sovereignty, the said territory, with all its rights and appurtenances, as fully and in the same manner as they have been acquired by the French Republic, in vii'tue of the above-mentioned treaty, concluded with His Catholic Majesty.”
*491 It will thus be seen that whatever territory was theretofore owned by France and Spain was ceded to the United States, but in neither of the treaties were the boundaries of “the colony or province of Louisiana” definitely fixed; but the United States, acting upon the belief that France and Spain had in some way dehors the treaty, determined the Rio Grande to be the western boundary of the territory ceded and retro-ceded (Adams’s History U. S., vol 2, p. 6), made that claim.
This was controverted bjT the Spanish Government, and after much correspondence the differences between the two Governments were settled by the treaty of February 22, 1819 (8 Stat. L., 252), whereby the United States by article 2 acquired by cession from Spain the territory east of the Mississippi River known as East and West Florida, while the boundary line between the two countries west of the Mississippi River was defined by article 3 as beginning “on the Gulf of Mexico, at the mouth of the river Sabine, in the sea, continuing north along the western bank of the river to the thirty-second degree of latitude; thence by a line due north to the degree of latitude where it strikes the Rio Roxo of Nachitoches, or Red River; then following the course of the Rio Roxo westward to the degree of longitude 100 west from London and 23 from Washington; then crossing the said Red River and running thence by a line due north to the river Arkansas; thence following the course of the southern bank of the Arkansas to its source, in latitude 42 north; and thence by that parallel of latitude to the South Sea.” * * * “The United States hereby cede to His Catholic Majesty and renounce forever all their rights, claims, and pretensions to the territories tying west and south of the above-described line; and, in like manner, His Catholic Majesty cedes to the said United States all his rights, claims, and pretensions to any territory east and north of said line.”
By the treaty thus made it will be noted that the United States renounced or quitclaimed to Spain all their right and pretensions to the disputed territory — that is to say, the territory west of the Sabine River and south of the northern line defined by the treaty, thence west to the Rio Grande — while Spain ceded to the United States all her claims and pretensions to any territory east and north of that line.
*492 If we should assume that the United States owned the controverted territory by virtue of their treaty with France in 1803, and that by virtue thereof the claimants’ decedent at the time of his birth, in 1809, acquired citizenship in the United States in right of his parents under article 3 of that treaty, which entitled inhabitants of the ceded territory to “ be incorporated in the Union of the United States and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages, and immunities of citizens of the United States,” the question would still remain open as to said Sandoval’s status after the treaty of 1819. But the court can not assume that the disputed territory was acquired by cession from France by the treaty of 1803. On the contrary, at least one provision of the treaty of 1819 seems to rebut such presumption.
By article 6 of the treaty of 1819 it is provided that the inhabitants of the territories which His Catholic Majesty cedes to the United States bjr this treaty shall be “ incorporated in the Union of the United States as soon as may be consistent with the principles' of the Federal Constitution and admitted to the enjojrment of all the privileges, rights, and immunities of the citizens of the United States;” but there is no provision in the treaty with reference to the citizenship of the inhabitants in the disputed territory, thus indicating to our minds that such temtory had not up to that time ceased to be Spanish territory, and for that reason no provision was necessary concerning their citizenship under the Spanish Government.
The court can not regard these treaties as affecting or changing the citizenship of any person dwelling within the limits of the disputed territory. Spaniards continued to be Spaniards and Americans continued to be Americans, and their children were of the citizenship of their parents.
The court has no knowledge of any case where a like claim has ever been made. The inhabitants of, say, the town of Santa Fe were universally regarded as Spaniards, or Mexicans, until the United States acquired that territory by treaty. The treaty of Guadalupe-Hidalgo recognized all of those inhabitants as Mexican citizens, and made provision for their remaining such or becoming citizens of the United States at *493 their own election. Expatriation and change of allegiance require the action or assent of the individual, express or implied, and must rest upon his voluntary act or upon some treaty provision. A child of American citizens in Spain does not become a Spaniard through accident of birth; and the children of aliens born in the United States have an election whether they will become citizens of the United Stat.es or remain citizens of their parents’ country.
On the former trial of this case it was, as stated in the opinion of the court, conceded that the claimants’ decedent ‘‘was born on Mexican territory, a citizen of Mexico,” and afterwards acquired citizenship in the United States through his citzenship in the Bepublic of Texas, which latter claimed to own by conquest the disputed territory at the time of her annexation to the United States.
This question is so fully covered in the former opinion of the court that little more need be said.
It is true that after the people of Texas had declared their independence, adopted a constitution, establishing a republic, and by act of her legislature declared her boundaries so as to include the territory east of the Bio Grande, the territory then known as the province of Mexico was claimed by Mexico on both sides of the Bio Grande; and that part of the territory east of the Bio Grande was in dispute when the war between the United States and the Bepublic of Mexico began; that while Texas had achieved her independence and declared her western boundary so as to include the disputed territory, she had never conquered or reduced to possession the territory or brought it within the government and laws of the Bepub-lic of Texas. On the contrary, when war began between the United States and the Bepublic of Mexico, Mexico was in possession of the disputed territory with a government established at Santa Ee, supported b}’’ an armed force to repel invasion or encroachment, as recited in the President’s proclamation of July 24, 1848 (Messages, vol. 4, p. 594).
So that the claimants’ decedent was not only born on Mexican territory, but continued subject to the Government and laws of Mexico until he acquired citizenship in the United States under the treaty of Guadalupe-Hidalgo.
Eor this and other reasons, which need not be gone into *494 further, the court must adhere to its former conclusion that the claimants’ decedent was born a subject of Spain and did not become a citizen of the United States until the expiration of the year prescribed by the treaty of Guadalupe-Hidalgo— that is to say, “ one year from the date of the exchange of ratifications” of the treaty, which latter took place May 30, 1848..
Therefore the claimants’ decedent, by his election so to do, became a citizen of the United States May 31, 1849, and as the depredation alleged of December 15, 1848, was prior to the date óf his becoming a citizen of the United States, the petition in that ease, No. 3815, must be dismissed.
As the depredation alleged in the petition to have occurred July 10,1849, was subsequent to the date when the claimants’ decedent became a citizen of the United States, the next question which arises is, Can there be a recovery under the Indian depredation act of 1891 for a depredation committed in the territory thus acquired (New Mexico) before the extension of the act of June 30, 1834 (4 Stat. L., 729), known as “Anact to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontiers ? ”
This case is prosecuted under the act of March 3, 1891 (26 Stat. L., 851), known as the Indian depredation act, which is the act of our jurisdiction and is remedial.
We have heretofore uniformly held that the act does not create claims nor impose liabilities upon the Indians; that whatever rights the citizen has for depredations committed by Indians must have arisen under treaties or the act of 1834, and that before the Indians or the Government can be held liable it must appear that the citizen had suffered the loss or destruction of his property by Indians belonging to some band, tribe, or nation in amity with the United States. In other words, ihe liability of the United States follows that of the Indians, which must have existed, if at all, prior to the passage of the act of 1891, for by the last paragraph of section 2 of that act it is provided “that no suit or proceeding shall be allowed under this act for any depredation which shall be committed after the passage thereof.” Therefore to entitle a citizen to maintain an action in this court the depredation made the basis of a claim must have been com- *495 mittecl prior to the passage of the act of 1891, and, too, by Indians belonging to some tribe in amity with the United States; and, furthermore, such citizen must, by reason of such loss, have thereby acquired a right to compensation from such tribe. If this be true, then it follows that such right must have accrued, if at all, under the act of 1834, as there was no treaty and that was the only act in force at the time of the passage of the act of 1891.
Section 1 of the act of 1834 provides that “all that part of the United States west of the Mississippi, and not within the States of Missouri and Louisiana or the Territory of Arkansas, and also that part of the United States east of the Mississippi River and not within any State to which the Indian title has not been extinguished for the purposes of this act, be taken and deemed to be the Indian countiy.”
New Mexico not then being a part of the United States, was not, of course, included within the above description.
Section 11 of the same act piovides “that if any Indian or Indians, belonging to any tribe in amity with the United States, shall, within the Indian country, take or destroy the property of aiy person lawfully within such country, or shall pass from the Indian country into any State or Territory inhabited by citizens of the United States, and there take, steal, or destroy any horse, horses, or other property belonging to aiy citizen or inhabitant of the United States, such citizen or inhabitant, his representative, attorney, or agent, may make application to the proper superintendent, attorney, or agent” for compensation as therein provided.
As no provision was made in the treaty of 1848 for extending the laws of the United States to that Territory, the intercourse act of 1834 did not apply to depredations committed therein by Navajo Indians who were domiciled in that Territory, unless the act of its own force was so extended.
This latter, however, does not appear to have been the view taken by the Congress or the Executive, for by the act of September 9,1850, section 11 (9 Stat. L., 446, 452), providing, among other things, for the establishment of a Territorial government for New Mexico, it was provided “that the Constitution, and all laws of the United States which are not locally inapplicable, shall have the same force and effect *496 within said Territory of New Mexico as elsewhere within the United States.”
On the same day the Senate ratified the treaty entered into between the United States and the Navajo Indians, September 9, 1849 (9 Stat. L., 974), whereby the Indians, in Article III, acknowledged that by virtue of the treaty of Guadalupe Hidalgo they were “placed under the exclusive jurisdiction and protection” of the United States, and they' agreed that the trade and intercourse act of 1834 “shall have the same force and efficiency, and shall be as binding and as obligatory upon the said Navajos, and executed in the same manner, as if said laws had been passed for their sole benefit and protection.”
But, as if the Congress had some doubt as to whether the act and treaty so passed and ratified were sufficient to accomplish the purpose, they, by the act of February 27,1851, section 7 (9 Stat. L., 587), provided “that all the laws now in force regulating trade and intercourse with the Indian tribes, or such provisions of the same as may7 be applicable, shall be, and the same are hereby, extended over the Indian tribes in the Territories of New Mexico and Utah. ”
It is at least reasonable to presume that had the Congress believed that the Constitution and laws of the United States had by their own force extended to the territory acquired by conquest and by treaty they would not have passed the acts they did.
Later, by Revised Statutes, section 1891, it was provided: “The Constitution and laws of the United States which are not locally inapplicable shall have the same force and effect within all the organized Territories and in every Territory hereafter acquired as elsewhere in the United States.”
From the foregoing acts, as well as from other acts of the Congress extending the Constitution and laws of the United States to territory acquired by7' treaty, as in the cases of Louisiana, Florida, and Alaska, it would seem that Congress, by7 their acts, had construed that provision of section 3, Article IV, of the Constitution as giving them plenary power to make all needful rules and regulations respecting the territory and other property belonging to the United States, and that as the Constitution also empowers the Congress “ to regulate *497 commerce with * * * the Indian tribes,” it follows that the extension of the act of 1834 “oyer the Indian tribes in the Territories of New Mexico and Utah” was a necessary exercise of such power, without which the act of 1834 would not have been in force in said Territory, unless by virtue of .the treaty with said Indians as aforesaid, about which we need not now express an opinion, as it is not necessary to the decision of this case.
On this question the decisions of the Supreme Court, as stated in the case of Downes v. Bidwell (182 U. S. R., 244, 258), “have not been harmonious.” Some of them are based upon the theoiy that the Constitution does not apply to the Territories without legislation. Other cases arising in Territories where such legislation has been had contained language which would justif}' the inference that such legislation was unnecessary and that the Constitution took effect immediately upon the cession of the territory to the United States.”
In the case of American Insurance Company v. Canter (1 Pet., 511, 542) the court, speaking by Chief Justice Marshall, said: “ Perhaps the power of governing a Territoiy belonging to the United States, which has not by becoming a State acquired the means of self-government, may result necessarily from the facts that it is not within the jurisdiction of any particular State and is within the power and jurisdiction of the United States. The right to govern maj7 be the inevitable consequence of the right to acquire territory. Whichever may be the source whence the power is derived, the possession of it is unquestioned.”
And, later in the case of the Mormon Church v. The United States (136 U. S., 1-42), it was said “The powers of Congress over the Territories of the United States is general and plenary, arising from and incidental to the right to acquire the territory itself, and from the power given by the Constitution to make all rules and regulations respecting the territory or other property belonging to the United States.”
But without further examination of the authorities on this question, we now take it that whatever doubt may have existed as to whether the Constitution and laws of the United States, of their own force, extended to territoiy acquired by *498 conquest or by treaty, has been removed since the decision in the case of Downes v. Bidwell (supra), where the court, after reviewing the various acts of the Congress respecting the Territories of the United States, at page 258, says: “It is sufficient to say that Congress has or has not applied the revenue laws to the Territories, as the circumstances in each case seemed to require, and has specifically legislated for the Territories whenever it was its intention to execute laws beyond the limits of the States. Indeed, whatever may have been the fluctuations of opinion in other bodies (and even this court has not been exempt from them), Congress has been consistent in recognizing the difference between the States and Territories under the Constitution.”
And after a careful review of the various decisions of the Supreme Court respecting the legislation of Congress with refei’ence to Territories, the court, at page 219, says:
“In all these cases, as well as in Territories subsequently organized west of the Mississippi, Congress thought it necessary either to extend the Constitution and laws of the United States over "them, or to declare that the inhabitants should bo entitled to enjoy the right of trial by jury, of bail, and of the privilege of the writ of habeas corpus, as well as other privileges of the bill of rights.
“We are also of opinion that the power to acquire territory by treaty implies not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their status shall be in what Chief Justice Marshall termed the ‘American Empire.’ There seems to be no middle ground between this position and the doctrine that if their inhabitants do not become, immediately upon annexation, citizens of the United States, their children thereafter born, whether savages or civilized, are such, and entitled to all the rights, privileges, and immunities of citizens. If such bo their status, the consequences will be extremely serious. Indeed, it is doubtful if Congress would ever assent to the annexation of territory upon the condition that its inhabitants, however foreign they may be to our habits, traditions, and modes of life, shall become at once citizens of the United States. In all its treaties hitherto the treaty-makingpowerhasmade special provisionfor this subject; in the cases of Louisiana and Florida, by stipulating that ‘ the inhabitants shall be incorporated into the Union of the United States and admitted as soon as possible * * * to the enjoyment of all the rights, advantages, and immunities of citizens of the United States;’ in the case of Mexico, that they should ‘be *499 incorporated into the Union, and be admitted at the proper time (to be judged by the Congress of the United States),to the enjoyment of all the rights of citizens of the United States;’ in the case of Alaska, that the inhabitants who remained three years, ‘with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights,’ etc., and in the case of Porto Rico and the Philippines, ‘that the civil rights and political status of the native inhabitants * * '* shall be determined by Congress.’ In all these cases there is an implied denial of the right of the inhabitants to American citizenship until Congress by further action shall signify its assent thereto.”
The court, at page 286, further says:
“The executive and legislative departments of the Government have for more than a century interpreted this silence as precluding the idea that the Constitution attached to these Territories as soon as acquired, and unless such interpretation be manifestly contrary to the letter or spirit of the Constitution, it should be followed by the judicial department.” (Cooley’s Consti. Lim., secs. 81 to 85; Burrow-Giles Lithographic Co. v. Sarony, 111 U. S., 53, 57; Field v. Clark, 143 Ü. S., 491, 649.)
For the reasons we have given we must hold that neither the defendant Indians nor the United States are liable for the depredation committed by said Indians in the Territory of New Mexico July 10, 1849, prior to the time when the intercourse act of June 30,1834, was extended over that Territory, and the petitions in both cases will therefore be dismissed.