Weldon, J.,
delivered the opinion of the court:
This is a suit under what is known as the Indian depredation act (26 Stat. L., 851), and in the petition it is alleged that on September 25, 1870, the defendant Indians took and drove away 97 horses belonging to the claimant, and that on the-da.y of November, 1870, the same Indians took and drove away 125 horses belonging to the claimant, aggregating-in value the sum of $11,100. The findings show that at the times stated in the petition the Indians took from claimant horses aggregating in value the sum of $5,320.
There can be no serious dispute as to the amity of the Indians at the time of both depredations; but it is most earnestly contended that the Indians, at the time of the depredations, were not Indians belonging to the United States; but that they were “domiciled in the Republic of Mexico, under the jurisdiction of that country, and not under the jurisdiction of the United States.”
The depredations were committed in the county of McMul-len, in the State of Texas, which lies in the southern portion of the State and not very far from the border line of Mexico. The statute giving the court jurisdiction does not specifically define the Indians for whose depredations a recovery may be had, simply describes them as Indians; but it must be assumed that the law did not intend to hold the United States collaterally liable for the depredations of Indians having no political connection with the United States at the time of the depredation. There must be some relation of responsibility between the United States and the Indians on which to predicate *424 the claim before a liability can be adjudged against the defendants.
The Kiekapoo Indians who committed the depredation went to the Republic of Mexico during the summer of 1864, at the solicitation of a band of Kickapoos who had gone to that countiy about the year 1850, and had become domiciled in Mexico by the consent of the Mexican Government.
It is insisted by the counsel for the United States, that the Indians had the right of expatriation; that they emigrated to Mexico not expecting to return, and that in law they became assimilated with the Indians of Mexico and thereby ceased to have any relations with the United States; and having no relations with the United States, no responsibility can arise for their acts.
In the view which the court has taken of the law of this case, it is not necessary to pursue an investigation into or indulge in a discussion of the complex doctrine of expatriation, as it may be presented in the case of American Indians crossing the line which separates the territoiy of the United States from the territory of other nations. The legal status of the Indians who remain within the territorial jurisdiction of the United States has been the subject of many decisions of the Supreme Court; and their relation to the United States may be considered as well defined and adjudicated.
The law upon that subject is condensed in the case of the United States v. Kagama, 118 U. S., 382, in which it is said by Mr. Justice Miller:
“In the opinions in those cases they are spoken of as ‘ wards of the nation,’ “pupils,’ as local dependent communities. In this spirit the United States has conducted its relations to them from its organization to this time. But, after an experience of a hundred years of the treaty-making system of government, Congress has determined upon a new departure — to govern them by acts of Congress. This is seen in the act of March 3,1871, embodied in section 2079 of the Revised Statutes':
“ ‘ No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March third, eighteen hundred and seventy-one, shall be hereby invalidated or impaired.’ ”
*425 It is also said in substance that the States have no power over the Indians as long as they maintain their tribal relations, and that they owe no allegiance to a State within which their reservation may be established and the State gives them no protection. (Cherokee Nation v. Georgia, 5 Peters, 1; Wooster v. State of Georgia, 6 Peters, 515, 536.)
The depredating Indians left the United States during the civil war, and at the time the Republic of Mexico was struggling against the usurpation and invasion of Maximilian, so that neither nation was in a condition to assert or maintain a policy having reference peculiarly to its domestic condition. The Mexican Government had, however, before that time recognized the fact of the emigration of the Kickapoo Indians who had gone into its territory many years before the settlement of the depredating Indians, and had acquiesced in the permanent location of the Indians who had emigrated in 1850.
In the case of Fellows v. Blacksmith et al. (19 How., 366), it is decided that the only power having jurisdiction and control of the Indians is the United States, and that no relations exist between the Indians and the States so long as the tribal condition is maintained. That decision was afterwards affirmed in the case cited in 118 U. S. (supra). The United States having the exclusive guardianship of the Indian, that guardianship exists in law so long as it is not renounced or disavowed upon the part of the guardian. It is not within the power or caprice of the ward to terminate the relation, and there is nothing in the facts found in this case tending to show that the United States relinquished their right or disavowed the responsibility of their guardianship.
But, on the contrary, it is shown that on the 24th day of June, 1875, the American minister of foreign affairs in Mexico addressed a communication to the President of the Republic of Mexico, in which it is said in substance, that the Government of the United States for maiy years made itself responsible for the support, education, and care of the Kickapoo Indians, whose guardian it is; that they were placed on a special reservation and are under the jurisdiction and supervision of the official agents of the Government. That during the late war the Indians took advantage of a temporary suspension of the authority of the United States to abandon their *426 reservation, and that they came into the Republic of Mexico without the consent and contrary to the policy of the Government of Mexico, at a time when its power was also partially suspended by European intervention; and it is further stated in the communication of the minister that in view of this state of facts he was constrained to express the opinion that his excellency’s Government has erred in deciding that it could not require these Indians to return to their reservation, and that under the circumstances they could only be considered as refugees from the authority of the United States, and that in a spirit of international comity they should again be returned to the territory of the United States.
It is further contended on the part of the defendants that inasmuch as the Indians did not pass from the Indian country within the meaning of the act of June 3, 1834 (4 Stat. L., p. 731), in which it is provided that “if any Indian or Indians belonging to anjr tribe in amity with the United States shall, within the Indian country, take or destroy the property of any person lawfulty within said country, or shall pass from the Indian country into any State or Territory inhabited by citizens of the United States and there take,” etc., there can be no recovery in this proceeding.
If the Indians had remained in the State of Texas during* the time they were in Mexico and had committed the depredation, as shown by the findings, could there be any question of the right of the claimant to recover? It is not necessary that the Indians committing a depredation be directly .from the Indian country. If they are within the jurisdiction of the United States, and in a condition of amity, a responsibility attaches to them for the consequences of the wrongs defined by the statute and a consequent liability upon the part of the United States. If the depredation be committed within the Indian country, then other questions might arise which are not applicable to the conditions of this proceeding.
The theory of liability is that the ward being at the time of the depredation within the territorial limits of the United States are in legal contemplation within the control of the United States, and therefore the United States are collaterally responsible.
*427 In the case of Corralitos Stock Co. v. The United States and Apache Indians (33 C. Cls. R., 342) it is said:
‘‘Every claim here pending under the remedial statute of 1891 must turn back to the statute of 1834 to establish a right to recovery. The act limits the claims to those arising from depredations committed by ‘any Indian or Indians belonging to any tribe in amity with the United States,’ and fixes the place of loss as ‘within the Indian country,’ or any ‘State or Territory inhabited bjr citizens of the United States.’”
The case was afterwards affirmed by the Supreme Court (178 U. S., 280) in an elaborate opinion affirming the view which the court adopted not only in this case but in many cases decided under the act of 1891, holding the view that a liability attaches to the Indians when within the Indian country or within a State or Territory inhabited by citizens of the United States. The Indians left the reservation in going to Mexico in the year 1864, but came back to the State of Texas at the time they committed the depredations; they were not fresh from the Indian country, but they left the United States without the consent of their guardian, and were finally brought back to their ancient habitat by the act of the Government.
The Mexican Government regarded the Indians as having such right in Mexico as that it would not require them to return; but the United States took issue with that theory of international law, and that at the best the Indians were but refugees in the territory of Mexico, and being such the United States had a right to insist upon their return. The Government through its minister regarded their presence in Mexico as a temporary sojourn, and upon that theory, when they came to the United States, as they did in 1870, and committed the depredation on the rights of the claimant they became and were Indians of the United States to all intents and purposes, and their sojourn in Mexico for six years did not have the legal effect of terminating their relations with the United States.
The executive branch of the Government whose duty it is to deal with the Indians has, through its accredited representatives, determined the legal status of the Indians at the *428 time the depredations were committed. They were brought back in pursuance of the asserted right and policj^ of the American minister; they left their reservation in 1864 in violation of the right and policj^ of the United States, and they were in amity with the United States at the time of the depredation, and for these reasons the court holds that it is a depredation for which the Indians and the United States are responsible, and a judgment is entered for the sum of $5,320, as shown in the conclusion of law.