Hoavry, J.,
delivered the opinion of the court:
Plaintiff was awarded judgment on the third count of his amended petition but denied relief on the second. (The first count was given no consideration because of its abandonment.) Thereupon he moved for a new trial, alleging error in dismissing the petition as to the second cause of action and in underestimating the value of the property as to that part of the complaint upon which judgment was awarded. But plaintiff’s motion is met by the counteraction of defendants, who object to any judgment at all, substantially upon the ground that after judgment the court decided in another case that neither the United States nor the Indian tribes in New Mexico were liable under the act of March 3, 1891 (26 Stat. L., 851), for depredations committed there prior to the extension of the trade and intercourse laws by act of Congress. (De Baca et al. v. United States, 37 C. Cls. R.., 482, and Same v. Same, Ind. Dep., No. 3651.)
The question arises whether the defenses successfully urged in the cases mentioned are available in the present controversj'.
It is contended for the claimant that the trade and intercourse act of June 30, 1834, was extended of its own force to the territory acquired from Mexico under the treaty of May 30, 1848, with that country; and, certainly that the provisions of an act of Congress (9 Stat. L., 452) putting in force and effect within the Territory of New Mexico the Constitution and laws of the United States not locally inapplicable, made the tribes there liable for depredations committed by them. But in any event, the claimant further contends, the treaty between the United States and the defendant Indians created liability for Navajo depredations because the provisions of that treaty put in operation the trade and intercourse laws, if the statutes did not.
*66 For the defendants these contentions are denied. They say that the act of 1831 did not become operative with the Guadalupe Hidalgo treaty concluded with Mexico and that the act organizing the Territory of New Mexico is open to serious question in its effect upon the extension of the trade and intercourse laws, and further insist that the Navajo treaty alone did not have the effect of extending these laws “possibly not until the intercourse laws were expressly extended over New Mexico in February, 1851” (1) Stat. L., p. 587, sec. 7).
Considering the issues on the merits as if the motion for new trial were granted — the parties consenting — we lay out of the case the depredation alleged to have been committed prior to February 16, 1851, which is the date of the only depredation about which there can be any controversy. The evidence as to any taking or destruction of property before the time last mentioned was not deemed sufficient to establish to the satisfaction of the court that any such depredation occurred. There is nothing offered now, nor promise of anything being offered in the future, which can change the result as to the loss charged in the second count, and no necessity arises to consider the question of liability under either law or treaty for anything in the complaint but the loss established by the judgment. And this was finalty conceded at the argument on the motion.
The penalty of compensation provided by the seventeenth section of the act of J une 30,1831, depends for application to the Navajo defendants (and collaterally to the United States) upon the time when Congress meant by their enactment on that subject to extend the trade and intercourse laws to the tribes inhabiting the Territory of New Mexico, unless such penalty was assumed by the defendant Indians under treaty with the United States at a different time. Inasmuch as a treaty when ratified by the Senate and proclaimed by Executive authority is the supreme law of the land as much as an act of Congress, liability can arise out of a treaty as well as by express enactment. (Art. 6, sec. 3, Cons.; Whitney v. Robertson, 121 U. S., 190.)
On the 9th day of September, 1819, a treaty was made and entered into between the Navajo tribe of Indians and the United States whereby it was provided:
*67 “ III. The Government of the United States having the sole and exclusive right of regulating the trade and intercourse with the said Navajoes, it is agreed that the laws now in force regulating the trade and intercourse, and for the preservation of peace with the various tribes of Indians under the protection and guardianship of the aforesaid Government, shall have the same force and efficiency, and shall be as binding and as obligatory upon the said Navajoes, and executed in the same manner, as if said laws had been passed for their sole benefit and protection; and to this end, and for all other useful purposes, the government'of New Mexico, as now organized, oí-as it may be by the Government of the United States, or by the legally constituted authorities of the people of New Mexico, is recognized and acknowledged by the said Navajoes; and for the due enforcement of the aforesaid laws, until the Government of the United States shall otherwise order, the territory of the Navajoes is hereby annexed to New Mexico.” (9 Stat. L., 971.)
Section 17 of the act of June 30, 1831 (4 Stat. L., 731, 732) provides:
“That if an,Indian or Indians belonging to any tribe in amity with the United States, shall, within the Indian country-, take or destroy the property of any person lawfully within such country, or shall pass from the Indian country into any State or Territory inhabited by citizens of the United States, and there take, steal, or destroy any horse, horses, or other property belonging to any citizen or inhabitant of the United States, such citizen or inhabitant, his representative, attorney, or agent may make application to the proper superintendent, attorney, or agent” for compensation therein provided. * * * And £jje meantime in respect to the property so taken, stolen, or destroyed, the United States guarantee to the party so injured an eventual indemnification. * * * And if the nation or tribe to which such Indian may belong receive an annuity from the United States, such claim shall at the next payment of the annuity be deducted therefrom and paid to the party injured; and if no annuity is payable to such nation or tribe, then the amount of the claim shall be paid from the Treasury of the United States.”
The treaty of September 9, 1849 (supra), was ratified September 9, 1850. Like any other treaty it should be liberally construed so as to carry out the apparent intention of the parties to secure equality and reciprocity between them. (De Geofroy v. Riggs, 133 U. S., 250.) The act of 1834 was upon the statute books when this treat}'' with the Navajoes *68 was proclaimed. The seventeenth section of the act was substantially of long standing. It appeared, in substance, in the law of May 19, 1796 (1 Stat. L., 469); in the act of March 3, 1799 (1 Stat. L., 717), and in the act of March 30, 1802, (2 Stat. L., 139). Its purpose was the preservation of peace with the tribes under the protection and guardianship of the General Government. The third article of the treat}'- with the Navajo tribe is meaningless and without application unless by that provision the tribe submitted- to the authority of the United States to regulate trade and intercourse by the act of 1831. Before the treaty became effective that act applied to other tribes. When the treaty was ratified the terms of the act applied as much to the Navajoes as to other tribes.
The treat}' taken altogether was not unilateral in character, but carried reciprocal obligations to be observed by both parties to it. Especially does the third article, taken in connection with numerous other articles of the agreement, include mutual promises and carry reciprocal obligations. The intercourse laws, which by this third article were declared to be as binding and obligatory on the Navajoes as if said laws had been passed for their sole benefit and protection, contained provisions peculiarly beneficial to the tribe. No person under these laws could trade with Indians without license, and any person other than an Indian forfeited all merchandise offered for sale to them. Indians could only barter with Indians, and all persons other than an Indian within the limits of the tribe were forbidden to hunt or trap; intruders were subject to removal; unauthorized settlers were to be driven off by military forces and property of friendly Indians injured or destroyed was to be paid for in twice its value. The limits of the tribe were not defined by the treaty, and the boundaries of no country were set apart to them. Title to the soil was not conferred where before the agreement title did not exist, but the treaty was designed to protect the Navajoes in their existing abode where the United States found them. The concluding article of the treaty provided for a liberal construction at all times and in all places to the end that the Indians should not be held responsible for the conduct of others, and that the Government of the United States should *69 so legislate and act as to secure the permanent prosperity and happiness of said Indians.
'Whether the act of February 27, 1851 (9 Stat. L., p. 587, sec. 7) was merely cumulative to other statutes on the same subject is not a matter necessary to bo inquired into for the purposes of this case. The treaty became effective for the depredation disclosed before the intercourse laws were by this final enactment extended over New Mexico.
If the treaty was dependent for its effectiveness upon the day fixed by statute for the organization of the government of New Mexico defendants are yet liable, because the depredation occurred just after the proclamation provided for by the eighteenth section of the act organizing the Territory of New Mexico (9 Stat. L., 452). The claim was one which the Secretary of the Interior was authorized to examine under the act of 1872 (17 Stat. L., 190), the act of 1885 (23 Stat. L., 376), and the act of 1886 (24 Stat. L., 44) as one arising under “existing laws or treaty stipulations.” It was filed in the Indian Office, and had the Secretary of the Interior made the necessary examination and allowed the claim it would have been treated as a preferred demand under the act of March 3, 1891 (26 Stat. L., 851).
It is not necessary that the Indians committing a depredation be directly from the Indian country. If they are within the jurisdiction of the United States and in a condition of amity, responsibility attaches. (Lowe v. United States et al., 37 C. Cls. R., 426.) We decide this case accordingly without reference to the question of whether the country inhabited by the Navajoes was Indian country or not. Liability resulted in either case.
In De Baca et al. v. United States (37 C. Cls. R., 482, 496) the apxilicability of the statutes was considered with reference to depredations committed December 18, 1848, and July 10, 1849. The treaty under consideration then had no existence, and the court expressed no opinion as to its effect upon the defendants in imposing liability.
Believing that the trade and intercourse laws were binding on the defendant Navajoes at the time of the commission of this depredation, February 16, 1851, we adhere to the judgment heretofore rendered establishing the liability of the *70 tribe and that of the United States as guarantors. From a careful review of the record wo have also reached the conclusion that the amount originally allowed the claimant did not fully cover the loss. Considering the doubt as to the number of cattle taken by the depredators, and the value of those which the evidence reasonably establishes were actually taken, we think the amount of the judgment should be increased, not to the extent claimed, but nevertheless enlarged beyond the sum original^ allowed.
The claimant’s motion for a new trial is allowed. The judgment heretofore rendered is vacated and set aside, and, treating the cause as if tried anew on the merits, judgment is this da}T entered in favor of claimant for the sum of one thousand two hundred and seventy-eight dollars ($1,278)..